617 P.2d 774

H. Louis HISER, Individually as surviving spouse of Bonita Kae Hiser, deceased, on behalf of himself and the minor child of Mr. and Mrs. Hiser, Plaintiff-Appellant,

v.

W. Alan RANDOLPH and Karin C. Randolph, husband and wife, Defendants-Appellees.

No. 1 CA-CIV 4303.

Court of Appeals of Arizona,
Division 1,
Department C.

July 29, 1980.

Rehearing Denied Sept. 9, 1980.

Review Denied Sept. 23, 1980.

Paul G. Rees, Jr., Tucson, for appellant.

Weyl, Guyer, MacBan & Olson, by K. C. Weyl and Thomas G. Bakker, Phoenix, for appellees.

## OPINION

JACOBSON, Judge.

In this medical malpractice case, two issues are presented for resolution: (1) Whether a physician paid by a hospital to render emergency room services has a duty to render care to anyone presenting themselves to the hospital for emergency care; and (2) under the facts presented here, whether plaintiff has raised a factual issue that proximate cause exists between the failure to render care and the subsequent death of the patient.

These issues were resolved by summary judgment in favor of the defendant physician, Dr. W. Alan Randolph, and the decedent's spouse has appealed.

Since this matter was disposed of by the trial court upon the defendant doctor's motion for summary judgment, the facts are taken in a light most favorable to the party opposing that motion. *Savoca Masonry Co. v. Homes and Son Construction Co.*, 112 Ariz. 392, 542 P.2d 817 (1975).

Mohave County General Hospital is the only hospital serving the community of Kingman, Arizona. It maintains an emergency room for the treatment of people in need of immediate medical service. Dr. Randolph and seven other doctors, comprising the medical profession in the Kingman area with admitting privileges at the hospital, established a program with the hospital by which each would take turns in manning the emergency room as the "on call physician" for a 12 hour period.

The on call physician was paid by the hospital at a basic rate of $100.00 for each day or shift served. Emergency patients and resident patients presenting themselves to the emergency room in need of immediate attention were referred to the on call physician.

From the record it appears that plaintiff's wife, Bonita Hiser, went with her husband to the emergency room at the hospital at approximately 11:45 p.m. on June 12, 1973. She was in a semi–comatose condition and the nurse in charge of the emergency room evaluated her as appearing to be very ill. Mrs. Hiser had an acute diabetic condition described as juvenile onset diabetes of the "brittle" variety. She had been treated in the emergency room at the hospital on the preceding day by Dr. Arnold of Kingman, her regular physician.

The emergency room nurse, after viewing Mrs. Hiser, immediately contacted Dr. Randolph, the "on call physician" at that time. Upon being advised as to who the patient was, Dr. Randolph stated to the nurse, at 11:50 p.m., that he would not attend or treat Mrs. Hiser, and that the nurse should call Dr. Arnold. When the nurse called Dr. Arnold he responded by stating that he would not come to the hospital at that time and that the on call physician should attend Mrs. Hiser. The nurse relayed this information to Dr. Randolph who again refused to attend to or see Mrs. Hiser. The nurse then called Dr. Lingenfelter, Chief of Staff of the hospital. After a subsequent telephone conversation between Dr. Lingenfelter and Dr. Randolph in which Dr. Randolph reiterated that he would not treat Mrs. Hiser, Dr. Lingenfelter came to the hospital and attended Mrs. Hiser, arriving at approximately 12:30 a.m. Dr. Lingenfelter immediately commenced tests and treatment for Mrs. Hiser, whom he regarded as being very ill at the time. Dr. Lingenfelter stayed at the hospital throughout the night until Dr. Arnold arrived in the morning. Mrs. Hiser died at 11:00 a.m. on June 13.

As to the reason for Dr. Randolph's refusal to attend to Mrs. Hiser, a factual dispute exists. Dr. Randolph testified by deposition that the refusal was based upon his inability to adequately treat diabetes. From the evidence presented, however, a trier of fact could conclude that the refusal was based upon a personal animosity between Dr. Randolph and Mrs. Hiser or the fact that Mrs. Hiser's husband was a lawyer. Because the fact that Dr. Randolph refused to treat is undisputed and because of the posture in which this matter reaches us, we assume the refusal was medically unjustified.

The expert testimony indicates that Mrs. Hiser was suffering from acute hyperglycemia according to tests which were run by Dr. Lingenfelter immediately after he arrived at the hospital at 12:30 a.m. on June 13. On the issue of causation, Dr. Bryant I. Pickering, a Phoenix doctor specializing in internal medicine with whom Mrs. Hiser had consulted on previous occasions, testified in his deposition that given the circumstances surrounding Mrs. Hiser's condition upon her admission to the emergency room that the patient was in need of immediate care by a physician. He was further of the opinion based upon his review of the admission records that Mrs. Hiser had a substantial chance for survival if hospital emergency room procedures had been instituted immediately and that if those procedures were withheld for an hour, the chance of survival would be reduced. In particular, the doctor testified that delay in treating Mrs. Hiser's chemical imbalance "would substantially increase the risk of death."

However, when specifically asked whether Mrs. Hiser would have lived if treatment had been started immediately upon her admission to the emergency room, Dr. Pickering responded that it would be impossible to say, but the "institution of treatment immediately is extremely important."

Dr. Pickering further testified:

Q: But nevertheless, you would not undertake to say that categorically the 40 minute delay did actually mean the difference?

A: No, that is correct. I cannot say that the categorically necessarily caused the death.

As previously indicated, Dr. Randolph's motion for summary judgment was two-pronged—a lack of duty running between himself and Mrs. Hiser and a lack of proximate cause between any delay occasioned by his refusal to treat and Mrs. Hiser's subsequent death. We will deal with these issues in that order.

As to the duty question Dr. Randolph contends that medical malpractice can only arise where the relationship of physician-patient is established; that this relationship is a consensual one; and that in the absence of special circumstances not present here, no physician can be required to treat a particular patient or incur liability for failure to do so. The plaintiff, while conceding the validity of this basic rule, contends that because of the contractual relationship between Dr. Randolph and Mohave General Hospital and the bylaws of the staff of that hospital, the doctor has obligated himself to treat all emergency patients.

In examining this issue we start with the general rule, with which we agree, that a medical practitioner is free to contract for his services as he sees fit and in the absence of prior contractual obligations, he can refuse to treat a patient, even under emergency situations.[1] *Findlay v. Board of Supervisors of Mohave County*, 72 Ariz. 58, 230 P.2d 526 (1951); *Agnew v. Parks*, 172 Cal.App. 756, 343 P.2d 118 (1959); *Hurley v. Eddingfield*, 156 Ind. 416, 59 N.E. 1058 (1901); *Childs v. Weis*, 440 S.W.2d 104 (Tex. Civ.App.1969). *See also*, Note, "Emergency Care", 7 U.C. Davis L.Rev. 246 (1974).

The question remains whether Dr. Randolph has contracted away this right, while being the doctor "on call" in charge of the

---

1. We speak here only of legal obligations. As to ethical obligations, see § 5, Code of Ethics of the American Medical Association which in part provides:

"A physician may choose whom he shall serve. In an emergency, however, he *should* render service to the best of his ability." (Emphasis added.)

emergency room at Mohave General Hospital and being paid the sum of $100 a day to perform those services.

■ It is now clear, in Arizona, that a hospital which provides emergency room services is obligated to provide those services to everyone who is in need of them.

*Guerrero v. Copper Queen Hospital*, 112 Ariz. 104, 537 P.2d 1329 (1975). Possibly in prerecognition of the hospital's obligation to undertake these services, bylaws were adopted by Mohave General Hospital to which Dr. Randolph was a party and bound. These bylaws in pertinent part provide:

MEDICAL STAFF          BY–LAWS

MOHAVE GENERAL HOSPITAL

PREAMBLE

Acknowledging their responsibilities to the patient and to the hospital for the quality of medical care and recognizing that the best interests of the patient, the community and the hospital are protected by concerted effort, the physicians practicing in Mohave General hospital hereby organize themselves, subject to the ultimate authority of the hospital governing board, in conformity with Bylaws, Rules and Regulations hereinafter stated.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

ARTICLE II

PURPOSES

The purposes of this organization shall be:

1. To insure that all patients admitted to this hospital or treated in the Emergency Room receive the best possible care.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

ARTICLE III

MEMBERSHIP

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

SECTION 2. ETHICS

The principle of Medical Ethics as adopted or amended by the American Medical Association shall govern the professional conduct of the members of the medical staff.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

The rules and regulations promulgated as a part of the bylaws provided as follows:

RULES AND REGULATIONS

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

9. Except in emergency, no patient shall be admitted to the hospital until after a provisional diagnosis has been stated and the consent of the administrator or his delegate secured. In case of emergency the provisional diagnosis shall be stated as soon after admission as possible.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

11. The hospital shall admit patients suffering from all types of diseases . . . .

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

30. Each member of the medical staff shall sign the bylaws, rules and regulations, and give his assent to the use of the hospital formulary.

---

In our opinion, Dr. Randolph, by assenting to these bylaws, and rules and regulations, and accepting payment from the hospital to act as the emergency room doctor "on call," personally became bound "to insure that all patients ... treated in the Emergency Room receive the best possible care," and agreed to insure "in the case of emergency the provisional diagnosis shall be started as soon after admission as possible." Moreover, these services were to be performed for all persons whom the "hospital shall admit ... suffering from all types of disease."

While the various doctors in this case indicated that they were of the belief they had the right to refuse to treat an individual under varying circumstances, the obviously intended effect of the bylaws and rules and regulations was to obligate the emergency room doctor "on call" to provide

emergency treatment to the best of the doctor's ability to any emergency patient of the hospital. Under these circumstances, the lack of a consensual physician–patient relationship before a duty to treat can arise has been waived by the signatory doctors.

Dr. Randolph cites rules 4 and 7 of the hospital rules and regulations, set forth in the margin,[2] in support of his position, but we do not think they qualify the duty to attend under the facts as thus far developed. Dr. Arnold, Mrs. Hiser's attending physician, effectively designated Dr. Randolph to attend Bonita Hiser on the night in question.

■ Viewing the evidence as we must on a motion for summary judgment, *Boyle v. City of Phoenix*, 115 Ariz. 106, 563 P.2d 905 (1977), Mrs. Hiser was in obvious need of emergency treatment. If there were other reasons possibly tending to excuse Dr. Randolph from attending to Mrs. Hiser, arising out of their previous relationship or otherwise, they have been stated by the doctor's counsel to be irrelevant to this appeal. We hold on the basis of the record and the issues presented to us that Dr. Randolph was obligated by contract to treat Mrs. Hiser to the best of his ability.

Our holding, as such, is not in any sense based upon Section 5 of the Code of Ethics previously quoted in footnote 1, *supra*. Our holding would be the same even without the incorporation of the Code of Ethics into the bylaws. The provision in the Code of Ethics in regard to emergency treatment is confirmatory, however, of an overall intent that emergency patients be treated as quickly as possible.

There remains the question of whether appellant presented adequate evidence of proximate causation to indicate a genuine issue of material fact in that regard. The question is not without difficulty.

■ In this jurisdiction the tortious act or malpractice must be shown to have been the probable and not merely a possible cause of the death or other untoward result. *Kreisman v. Thomas*, 12 Ariz.App. 215, 469 P.2d 107 (1970). Soundly reasoned authority from other jurisdictions is in accord. *Cooper v. Sisters of Charity of Cincinnati, Inc.*, 27 Ohio St.2d 242, 272 N.E.2d 97 (1971); *Morgenroth v. Pacific Medical Center, Inc.*, 54 Cal.App.3d 521, 126 Cal.Rptr. 681 (1976).

As stated in *Cooper v. Sisters of Charity of Cincinnati, Inc.*:

> We consider the better rule to be that in order to comport with the standard of proof of proximate cause, plaintiff in a malpractice case must prove that defendant's negligence, *in probability*, proximately caused the death.

272 N.E.2d at 103. (Emphasis in original.) In this regard, "probable is more than 50% of actual." *Id.*, 272 N.E.2d at 104.

■ In the final analysis, in the present case, this means that plaintiff must show by expert testimony that Bonita Hiser probably died as a result of the 40 minute delay in testing and treatment occasioned by Dr. Randolph's refusal to attend her, rather than as a result of other circumstances. *See Butler v. Rule*, 33 Ariz. 460, 265 P. 757 (1928).

We have closely analyzed Dr. Pickering's testimony. It does not state in express terms that Mrs. Hiser probably died as a result of the 40 minute delay in treatment. However, contrary to Dr. Randolph's contention, we cannot interpret it as negating the probability that such delay caused death, although Dr. Pickering was unable to say categorically that the delay was the cause.

---

2. 4. Private patients shall be attended by their own private physicians. Private patients applying for admission who have no attending physician shall be referred to the physician on call.

   \*   \*   \*   \*   \*   \*

7. Each member of medical staff not resident in the city or immediately available shall name a member of the medical staff who is resident in the city, who may be called to attend patients in emergency. In case of failure to name such associate, the administrator of the hospital shall have authority to call any member of the staff should he consider it necessary.

We agree with the court in *Cooper v. Sisters of Charity of Cincinnati, Inc.,* supra, that the mere loss of an unspecified increment of the chance for survival is, of itself, insufficient to meet the standard of probability. 272 N.E.2d at 103. We accordingly reject the dictum of Judge Sobeloff to the contrary in *Hicks v. United States,* 368 F.2d 626 (4th Cir. 1966). We also reject as persuasive authority the case of *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978), cited by plaintiff, because it was exclusively concerned with liability under Section 323 of the Restatement (Second) of Torts.

While the questions put to and answered by Dr. Pickering are largely directed to the question of increased risk of death without any qualification thereof, there are elements of it which point to probability. Dr. Pickering indicated that Mrs. Hiser's condition was reversible at about midnight and his testimony refers repeatedly to the need for drastic and immediate action. While there are many questions that may be raised with respect to Dr. Pickering's testimony, including questions relating to Dr. Randolph's knowledge in the area of treating diabetes, it is our opinion that its tenor is such that in view of the principle that all doubts are to be resolved by trial, the existence of a genuine issue of material fact has not been negated on the present record. *See Tessitore v. McGilvra,* 105 Ariz. 198, 461 P.2d 675, *supplementing on rehearing* 105 Ariz. 91, 459 P.2d 716 (1969).

In view of the foregoing, it is unnecessary for us to consider plaintiff's further contention that he timely and adequately stated a claim for the perpetration of an outrage.

The judgment is reversed and the cause is remanded for further proceedings consistent herewith.

OGG, C. J., Division 1, and CONTRERAS, P. J., concur.