688 P.2d 647

Ada Carol THOMPSON, on Behalf of herself and as next friend of Michael JESSEE, a minor child, Plaintiffs-Appellants,

v.

SUN CITY COMMUNITY HOSPITAL, INCORPORATED, an Arizona corporation, d/b/a Walter O. Boswell Memorial Hospital; Jon R. Hillegas, M.D.; Steven J. Lipsky, M.D.; Emergency Room Physicians, Inc., Defendants-Appellees.

No. 1 CA–CIV 5442.

Court of Appeals of Arizona, Division 1, Department A.

March 29, 1983.

Robert Stephan, Jr., P.C. by Robert Stephan, Jr., Phoenix, for plaintiffs-appellants.

Weyl, Guyer, MacBan & Olson by Kenneth C. Weyl, Thomas G. Bakker, Phoenix, for defendant-appellee Boswell Memorial Hosp.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Harding B. Cure, Larry L. Smith, Phoenix, for defendants-appellees Lipsky and Emergency Room Physicians, Inc.

Snell & Wilmer by John J. Bouma, Robert J. Gibson, Phoenix, for defendant-appellee Jon R. Hillegas, M.D.

OPINION

KLEINSCHMIDT, Judge.

This case arises out of the transfer of an injured boy from the emergency room of Boswell Memorial Hospital to Maricopa County Hospital. The boy was transferred because he was financially ineligible for admission to Boswell. He brought this action through his mother acting as his next friend to recover compensatory and punitive damages for injuries which he alleged were aggravated by the failure to give prompt treatment at Boswell. His mother sued in her own right to recover for negligent infliction of emotional distress. The defendants were Boswell Memorial Hospital; Dr. Steven J. Lipsky, the emergency room physician; Dr. Jon R. Hillegas, a vascular surgeon consulted by Dr. Lipsky, and Dr. Alvina Sabanas, an orthopedic surgeon who saw the boy at Boswell.

The case was tried to a jury. The case against Dr. Sabanas was dismissed by stipulation and the trial judge directed a verdict in favor of Dr. Hillegas at the close of plaintiff's evidence. The court also directed a verdict as to the mother's claim for negligent infliction of emotional distress. The jury found against the plaintiff in favor of the defendants Boswell Hospital and Dr. Lipsky. The plaintiff appeals from the orders directing verdicts and from the verdicts of the jury. The evidence was in sharp dispute on many points. Except as

to the directed verdict in favor of the appellee Hillegas, we view it, as we must, in the light most favorable to the parties in whose favor judgments were rendered below. *Paul Schnoonover v. Ram Construction, Inc.*, 129 Ariz. 204, 630 P.2d 27 (1981).

Thirteen year old Michael Jessee, the son of appellant Ada Carol Thompson, was pinned against a wall by an automobile which had fallen off a jack. The boy was immediately taken by ambulance to the emergency room at Boswell Hospital and arrived at approximately 8:30 p.m. Dr. Steven Lipsky, the physician on duty in the emergency room, determined that Michael's vital signs were not alarming and began a complete examination. Dr. Lipsky found that Michael's airway was uninjured, the boy's breathing sounded normal, and circulation to his brain was intact. At this time Dr. Lipsky ruled out any "truly life-threatening points." He then began a more careful examination of the head, chest, and abdomen, which all seemed to be functioning normally.

Dr. Lipsky then examined Michael's extremities, noting that he had a dressing on his left thigh and that the leg was internally rotated 90 degrees below the dressing and above the knee. The lower part of the boy's foot was pale and the toes were a dusky color, cool and clammy. Michael could not move his toes on the left foot nor could he feel Dr. Lipsky touch them. There were no pulses in the leg. Dr. Lipsky removed the dressing and observed a fourteen-inch laceration running from the upper thigh to just above the knee. Bone was visible at the lower end of the laceration in the region of the knee. The doctor was surprised to note that there was no bleeding from this injury.

After finishing the examination, Dr. Lipsky gave orders for lab work, i.v.'s, antibiotics, oxygen, insertion of a catheter, application of a splint to stabilize the fracture, and he requested that a vascular surgeon and an orthopedic surgeon be called. Michael responded well to the fluids administered, an indication that he had been suffering from the most mild form of hypovolemic shock when he arrived and that situation had been corrected. Dr. Lipsky testified that in his opinion Michael became stable after the fluids were administered and remained stable with minimal additional fluid therapy.

Dr. Lipsky consulted by telephone with Dr. Alvina Sabanas, the hospital's orthopedic surgeon on call. She told Dr. Lipsky that he should call a vascular surgeon and Dr. Sabanas arrived at the emergency room ten minutes later. She familiarized herself with Michael's record and then proceeded to examine the leg. The boy could not feel her touch nor could he move his ankle or toes. Dr. Sabanas then told Dr. Lipsky that Michael definitely needed a vascular surgeon and she conducted a complete physical examination from the head down. She examined the leg wound and noted that there was no bleeding. The X rays indicated that there were no chest injuries but that there were undisplaced fractures of the lower pelvic bones and a fracture of the large bone of the left thigh.

After Dr. Sabanas arrived Dr. Lipsky spoke by telephone with Dr. Jon Hillegas, a vascular surgeon, and Dr. Hillegas said that the leg would keep for what vascular surgeons call the "golden period" of at least six to eight hours. By this time Dr. Lipsky had been told that Michael might not be eligible for admission to Boswell for financial reasons and Dr. Lipsky mentioned this to Dr. Hillegas and asked him if he thought Michael could be transferred. Dr. Hillegas testified that he told Dr. Lipsky that from a vascular standpoint Michael was transferable. Dr. Hillegas was between 30 or 40 minutes away from Boswell. He said that he was never requested to come and that the patient could get to county hospital faster than he could attend the patient.

The administrative policy of Boswell Hospital regarding admission of emergency patients was as follows:

Any patient requiring emergency treatment including admission as an inpatient will be admitted to the hospital if failure to admit would, in the opinion of the

Emergency Room physician or that of a member of the Active Medical Staff of this Hospital, permanently jeopardize the life and/or health of the patient.

Dr. Lipsky testified that his role in the transfer decision, as emergency room physician, after a determination that a patient was not financially eligible for admission was to decide whether and when the patient was medically transferable.

Mrs. Thompson, Michael's mother, testified that she and her husband did not have insurance which would cover Michael's medical bills. Her husband, however, testified that they did have such insurance but on the evening of the injury he had told the hospital that they did not. The owner of the automobile offered his insurance for Michael's care but it was automobile liability insurance, which was not acceptable for medical care at Boswell. A representative of the hospital administration decided that Michael was not financially eligible for admission.

Dr. Lipsky then determined, with the concurrence of Dr. Sabanas and Dr. Hillegas, that Michael was "medically transferable"[1] and he informed Michael's parents of his intention to transfer. Mr. Thompson testified that his wife became extremely upset and begged the doctor not to send Michael to county hospital. He saw that "it [her behavior] was almost a complete breakdown." Others who were present in the emergency room testified to Mrs. Thompson's hysterical reaction upon learning from Dr. Lipsky that Michael would be transferred.

Michael left Boswell Memorial Hospital by ambulance at 10:21 p.m. and arrived at county hospital at 10:45 p.m. When he was placed in the ambulance for the trip he was resting comfortably and was alert, lucid, and complaining of some pain. The paramedic testified that he noticed no change in Michael's condition en route to county hospital although the boy's blood pressure

dropped slightly and consequently the i.v. flow was increased to correct that problem. Michael was stable throughout the trip and he was not in shock.

At 1:00 a.m. Michael underwent surgery at county hospital and Dr. Alan Ansel testified that the surgical team spent two hours exploring the abdomen and pelvic region. At 3:00 a.m. the surgeons began exploring Michael's left leg and found that the interior of the femoral artery had been torn, forming a flap which obstructed the flow of blood through the artery to the leg. The large bone in Michael's thigh was fractured and there was nerve injury as well. Dr. Ansel testified that viewing the procedure in retrospect, the surgeons at county could have worked on the leg first, or had two teams working simultaneously, one on the abdomen and the other on the leg.

Michael Jessee recovered from the accident but suffers serious residual effects which, according to testimony of Dr. Kent Pomeroy, a specialist in physical medicine and rehabilitation, were caused by the delay in restoring blood flow to the left leg.

In the appellant's view the permanent injury was caused by the delay occasioned by the decision to transfer Michael to county hospital. Appellee Boswell Hospital pointed instead to delays in treating the leg which resulted from judgmental decisions made by the surgical team at county hospital. Boswell further claimed that Dr. Ansel from county hospital testified that Michael's injuries would have resulted in significant residual injury regardless of the quality of care he received. Additionally, Dr. Eli Krigsten, an orthopedic surgeon, and Dr. Sabanas both testified that the treatment Michael received at county was a significant factor in producing his disability.

In her first argument the appellant contends that the trial court erred in failing to grant a motion for summary judgment against Boswell Hospital and in failing to

1. We use the term "medically transferable" to mean that transfer will not subject the patient to an unreasonable risk of harm to his life or health. This is the same definition the trial court gave the jury and it is fair to conclude from the record that that is how the witnesses understood the term.

grant a motion for a directed verdict. In her second argument the appellant says that the trial court erroneously instructed the jury that Boswell Memorial Hospital could, in cases of emergency, refuse to admit a patient for financial reasons and transfer him to another hospital if he is "medically transferable" in the judgment of the emergency room physician. Since both questions turn on the single issue of what duty is owed to an indigent emergency patient we combine our discussion of the arguments.

It is the appellant's position that every general hospital in the State of Arizona is required to give emergency care without reference to a patient's ability to pay and that if the hospital has facilities for treating the condition, whether on an outpatient emergency basis or as an inpatient it must do so even though the patient could be transferred to another hospital without unreasonable danger to the patient's life or health.

The appellant points out that A.R.S. § 36–405(A) requires that the Director of the Department of Health Services adopt reasonable rules and regulations to establish minimum standards and requirements for the licensure of health care institutions and that he shall use the current standards adopted by the Joint Commission on Accreditation of Hospitals and the Commission on the Accreditation of the American Osteopathic Association as guidelines in prescribing the minimum standards and requirements under the statute. She also points out that under Rule 9–10–248 governing the licensure of Health Care Institutions, promulgated pursuant to that statute, that all general hospitals must provide facilities for emergency care and that the Joint Commission on Accreditation of Hospitals has issued an accreditation manual for hospitals which contains, in a provision entitled Standard I, the following:

> The hospital must have some procedure whereby the ill or injured person can be assessed, and either treated or referred to an appropriate facility, as indicated. Most hospitals that offer a broad range of services can provide effective care for any type of patient requiring emergency service. Hospitals that offer a partial range of services may be capable of operating a limited emergency service only, and, therefore, must arrange for the transfer or referral of certain patients to other institutions. Some hospitals may elect to refer all emergency patients. In either case, the referring hospital must institute essential life-saving measures and provide emergency procedures that will minimize aggravation of the condition during transportation. Inherent in this action is the understanding that no patient should arbitrarily be transferred if the hospital where he was initially seen has means for adequate care of his problem.

In Standard IV the manual provides:

> Policies and procedures specifically for the medical staff shall relate to at least the following:
>
> . . . .
>
> Procedures for early transfer of severely ill or injured patients to special treatment areas within the hospital, such as the surgical suite, the intensive care unit, or the cardiac care unit.

The same manual under the term Patients' Rights states:

> Equitable and humane treatment at all times and under all circumstances is such a right. This principle entails an obligation on the part of all those involved in the care of the patient to recognize and to respect his individuality and his dignity. This means creating and fostering relationships founded on mutual acceptance and trust. In practical terms, it means that no person should be denied impartial access to treatment or accommodations that are available and medically indicated, on the basis of such considerations as race, color, creed, national origin, or the nature of the source of payment for his care.

On the basis of these rules and standards the appellant concludes that every emergency patient must be treated at the general hospital where he presents himself

whether or not he can be transferred without unreasonable risk to life or health.

The trial court rejected the appellant's argument and instead gave the following instruction to the jury.

Now, defendant Boswell Hospital is a private hospital and as such may establish its own eligibility requirements regarding ability to pay. It does have a duty to provide immediate and necessary emergency care to all persons regardless of ability to pay. The hospital may properly determine a patient's eligibility according to its own rules before admitting a patient as an in-patient for further definitive treatment, and may transfer a patient to another appropriate hospital if the patient is medically transferable.

A patient is medically transferable when in the judgment of the staff or emergency physician the patient may be transferred without subjecting the patient to an unreasonable risk of harm to his life or health.

An emergency is an unforeseen combination of circumstances creating a condition which in the professional judgment of a physician and surgeon of good standing acting under the same or similar circumstances requires immediate care, treatment or surgery in order to protect a person's life or health.

In support of their argument that a hospital may only refuse care for financial reasons for purely elective admissions the appellants rely heavily on *Guerrero v. Copper Queen Hospital* 112 Ariz. 104, 537 P.2d 1329 (1975). In that case two children who had been burned when a stove exploded in their home in Sonora, Mexico, sought emergency treatment at the Copper Queen Hospital in Bisbee, Arizona. They were denied emergency aid and subsequently brought suit to recover damages for the breach of duty to treat them. Their suit was predicated on the claim that a hospital which maintains an emergency ward and which by custom provides emergency service must treat all emergency · cases presented if the patient relied on the fact that the hospital customarily treated emergency cases. The superior court dismissed the complaint for failure to state a claim. The court of appeals reversed the decision of the superior court and the Supreme Court of Arizona accepted a petition for review. The supreme court concluded that a hospital which maintains emergency care facilities must provide emergency treatment and that this obligation is predicated upon A.R.S. § 36–405 and the regulations which ensue therefrom. *Guerrero* does not, however, discuss the question of whether or not indigent patients who are medically transferable can be transferred to another hospital.

■ We hold that a hospital which maintains an emergency room has a duty to provide immediate and necessary emergency care to all persons regardless of their ability to pay. Such a hospital may, however, determine a patient's ability to pay and may transfer financially ineligible patients to another appropriate hospital when, in the judgment of the medical staff or the emergency physician, such transfer can be effected without subjecting the patient to an unreasonable risk of harm to his life or health. The reasons for our holding are set forth below.

First, the appellant has not cited a single case which goes so far as to hold in favor of the proposition for which she contends. *Guerrero* deals with an outright refusal to treat in an unmistakable emergency and has nothing to do with the transfer of a patient and the question of whether such transfer will jeopardize life or health. Other cases cited by the appellant simply do not support her position. For example, in *Wilmington General Hospital v. Manlove*, 4 Storey 15, 54 Del. 10, 174 A.2d 135 (1961) there was a total failure on the part of the hospital to give any treatment at all. The Supreme Court of Delaware simply noted that in the presence of an unmistakable emergency there is a duty to treat if by custom people have come to rely upon the services of a hospital emergency room. It remanded the case for an evidentiary hearing on the question of whether or not an emergency existed.

In *Meiselman v. Crown Heights Hospital, Inc.*, 285 N.Y. 389, 34 N.E.2d 367 (Ct. of App.1941), also cited by appellant, there was evidence from which a jury could conclude that an inpatient in a hospital had been abandoned when it appeared that he was unable to pay. The case assumes that if it had been safe for the plaintiff to leave the hospital there would have been no liability on the part of the hospital.

Finally, in *Stanturf v. Sipes*, 447 S.W.2d 558 (Mo.1969), the hospital refused to admit a patient unless he paid in advance. This, the court said, would be improper in the face of a true emergency and noted that there was evidence from which a finder of fact could have found that an emergency did in fact exist. On these facts the court held that it was error to grant a motion for summary judgment in favor of the hospital. None of these cases discuss the point which we are called on to decide.

The case most clearly on point appears to be *Harper v. Baptist Medical Center-Princeton*, 341 So.2d 133 (Ala.1976). There a patient was treated in the emergency room for a severed artery. When it was discovered that the patient did not have hospitalization insurance the hospital refused to admit him as an inpatient and transferred him to another hospital. The trial court granted a directed verdict for the defendant hospital and the Supreme Court of Alabama ruled that it had properly done so because there was no evidence that the treatment received at the hospital created a condition which was the proximate contributing cause of the patient's permanent conditoin. The court noted that the treatment rendered by the hospital was not known to be likely to, and did not, create a condition which was extremely dangerous without further service.

A second reason why we conclude as we do is that to require every hospital to admit every financially ineligible person who presents himself for emergency care whose condition calls for inpatient treatment would ignore the distinctions between private and public hospitals. That distinction is specifically recognized in our statutory

scheme. A.R.S. § 11–297 provides for the hospital treatment of indigent patients upon the filing of an affidavit of indigency. A.R.S. § 11–297.01 provides:

Care at private or university hospital.
A. An indigent patient qualified for care under the terms of this article may be placed in a private hospital or hospital operated by a university:

1. When the county does not maintain a county hospital.

2. When the county hospital is too overcrowded to accommodate the patient.

3. When the patient requires a service provided by a private hospital or hospital operated by a university that is not provided by the county hospital.

B. *The county shall be liable for payment of all costs retroactive to the inception of treatment incurred by a private hospital or hospital operated by a university arising from emergency treatment and medical care administered at such hospital for a patient qualified for such care and treatment under the provisions of this article:*

*1. When the emergent condition of the patient is such that it is deemed medically inadvisable to transport the patient from the private hospital or hospital operated by a university for further treatment.*

2. When the county does not move the patient from the private hospital or hospital operated by a university within twelve hours after being notified by the private hospital or hospital operated by a university authorities of the location and condition of the patient.

C. The cost of hospital care and treatment at such private hospital or hospital operated by a university under the provisions of this section shall be a county charge payable by the county in which the patient maintains his residence to the private hospital or hospital operated by a university at a rate determined by the same method used for reimbursing providers of services under federal medical assistance programs or at such lower rate as the county and the private hospi-

tal or hospital operated by a university may agree upon. (emphasis added).

The entire statutory scheme has been construed in *St. Joseph's Hospital & Medical Center v. Maricopa County*, 130 Ariz. 239, 635 P.2d 527 (1981). That case held the county was liable for the payment of hospital expenses of a patient who was not indigent when admitted to a private hospital but became indigent by reason of charges incurred there. This court specifically noted the county was required to pay the reasonable hospital expenses provided that the private hospital notified the county as to the presence and location of a patient who could have reasonably been transferred from the private facility. Thus, it is the intent of the legislature that medically transferable indigents be treated in the county hospital.

Our decision is supported by the fact that there was considerable expert testimony in the record that transfer of emergency patients from an emergency room of one hospital to another hospital when there is no unreasonable risk of bodily harm arising from the transfer was within the standard of care exercised by doctors and hospitals in Arizona in 1976.

We see nothing in the regulations relating to health care institutions or in the standards promulgated by the Joint Commission on Accreditation of Hospitals that mandates a different result. Standard I of the Joint Commission's manual refers to transfers under undefined circumstances and the Patients' Rights section of the same publication talks about impartial access to treatment that is "medically indicated." The latter does not preclude transfers. The questions of who is "medically transferable" and what is "medically indicated" overlap.

The appellant contends that a rule such as we adopt would leave the decision to transfer to the unbridled judgment of an employee of the hospital. While it is true that such a rule leaves the decision to the doctor's judgment his exercise of that judgment is always measured against what is, in fact, reasonable under the circumstances

of each case. The record in this case simply presented a dispute as to whether or not it was reasonable to transfer Michael Jessee. The jury resolved that issue in favor of the defendant hospital and the emergency room physician and we will not disturb that decision.

The appellant next argues that a federal statute, 42 U.S.C.A. 300d–5(b)(4)(C)(ix), applied to the hospital and that by its terms the hospital was required to provide, without prior inquiry as to any ability to pay, necessary emergency medical services to all patients requiring such services. The record is very confusing as to whether Boswell Memorial Hospital was a participant in "an emergency medical services system" but for the purposes of this opinion we will assume that it was such a participant. We do not believe that the statute required Boswell to provide inpatient emergency care without first inquiring into a patient's ability to pay.

The provision in question is part of a statutory scheme which authorized the Secretary of Health, Education and Welfare to make financial grants to eligible entities to establish and operate an emergency medical system. It was designed to improve the delivery of emergency health care in particular geographical areas. The statute, in its relevant part, 42 U.S.C.A. § 300d–1 provides:

For purposes of this subchapter:

(1) The term 'emergency medical services system' means a system which provides for the arrangement of personnel, facilities, and equipment for the effective and coordinated delivery in an appropriate geographical area of health care services under emergency conditions (occurring either as a result of the patient's condition or of natural disasters or similar situations) and which is administered by a public or nonprofit private entity which has the authority and the resources to provide effective administration of the system.

42 U.S.C.A. 300d–5(b)(4)(C) specifies that to be eligible for a grant an emergency medical services system must:

(ix) provide, without prior inquiry as to ability to pay, necessary emergency medical services to all patients requiring such services; ....

We think it is clear that the term "emergency medical services system" refers to something more than any particular hospital. There is nothing in the statute which would preclude a private hospital that is a part of such system from inquiring into the ability of a patient to pay before providing emergency treatment to a medically transferable patient. The statute intended only that there be some facility within the emergency medical services system that must provide necessary treatment without prior inquiry into ability to pay.

Even if the federal statute were construed to apply to Boswell Hospital there is another reason why appellant's argument must fail. That is because the very question to be decided under the statute, that is, whether the defendant hospital failed to provide *necessary* emergency medical services to all patients requiring such services, was in effect answered in the jury's verdict rendered on appropriate instructions. It is implicit in the jury's verdict that the transfer was not an unreasonable risk to Michael Jessee's life or health. It is also implicit in that verdict that the hospital did render necessary emergency medical services.

The appellant next complains of the failure of the trial court to instruct in various areas of the law. First: she claims that based on 42 U.S.C.A. 300d–5(b)(4)(C) the court should have instructed that a failure to provide necessary emergency medical services without inquiry as to ability to pay was negligence *per se* as a violation of the statute. This issue is disposed of above. It was not error for the court to fail to give the requested instruction because the statute did not apply to Boswell Hospital.

The appellant next argues that the court erred in failing to give a correct proximate cause instruction. She offered the following instruction which the court rejected.

Before any defendant can be held liable for negligence it must be shown that this negligence proximately caused the plaintiff's injury. It is not necessary that the injury be caused only by the defendants' neglect, nor is it important that there might have been more than one cause of the injury. *It is sufficient that the defendants' negligence helped cause the injury or increased the chances that the injury would occur. Thus, if you find that the acts, or failures to act, on the part of the defendants, or one of them, increased the risk of harm to which Michael Jessee was subjected then the defendants' acts or omissions proximately caused Michael Jessee's injury.* (emphasis added).

Instead the court instructed the jury that the appellant had the burden of proving that the appellee hospital and/or doctors' negligence caused the injury. The jury was further told that the party having the burden of proof must persuade them that his claim is more probably true than not true.

The appellants cite a number of cases in support of their argument but the entire issue was resolved in *Hiser v. Randolph*, 126 Ariz. 608, 617 P.2d 774 (App. 1980), a case involving the question of whether a refusal to timely treat was the proximate cause of death, where this court said:

In this jurisdiction the tortious act of malpractice must be shown to have been the probable and not merely a possible cause of the death or other untoward result.

126 Ariz. at 612, 617 P.2d at 778.

The court went on to say:

[T]hat the mere loss of an unspecified increment of the chance for survival is, of itself, insufficient to meet the standard of probability.

126 Ariz. at 613, 617 P.2d at 779.

The appellants nevertheless urge the application of the *Restatement of Torts (Second)*, § 323, which reads:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm....

The appellants say that this court, in *Hiser*, did not reject that provision of the *Restatement*. We disagree. *Hiser* specifically rejected the holding of *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978), a medical malpractice action against a doctor and hospital, which in turn specifically held that the effect of § 323(a) of the *Restatement* was to relax the degree of certitude normally required of plaintiff's evidence in order to make a case for the jury.

Thus, *Hiser's* rejection of *Hamil* is a rejection of the *Restatement*, at least insofar as it applies to the degree of proof required on the issue of causation in medical malpractice cases.

■ The appellants next argue that the trial court erred in failing to give a punitive damage instruction. Even if we assume that the evidence would support such an instruction, since the jury returned a verdict of no liability in favor of all of the defendants any error in the refusal to give the instruction was harmless. *Medlyn v. Kimble*, 106 Ariz. 66, 470 P.2d 679 (1970); *Snethen v. Gomez*, 6 Ariz.App. 366, 432 P.2d 914 (1968).

The appellants offered to prove through an employee of Boswell Memorial Hospital, officers of an ambulance company, and other patients who had been treated in the Boswell emergency room that Boswell Hospital had transferred other indigent emergency patients to county hospital in a code 3 status, that is, in an ambulance with siren and red lights operating. The offer of proof did not extend as far as to show that such patients were transferred despite an unreasonable threat to life or health. Such evidence was excluded because in the opinion of the trial judge each incident would have to be tried separately on its own facts to determine whether or not the patients in question were medically transferable. The judge also excluded evidence, presented in an offer of proof, that Boswell Hospital had been cited by the Department of Health, Education and Welfare for failure to give equal care and treatment to the poor.

■ Rule 403, Ariz.R.Evid., provides that relevant evidence may be excluded if its probative value is substantially outweighed, among other things, by the danger of unfair prejudice, confusion of the issues, considerations of undue delay, waste of time, or needless presentation of cumulative evidence. As to the citation for failure to give equal care to the poor, nothing was offered to show the circumstances giving rise to or what resulted from the citation. The ruling of the trial judge under the circumstances was a proper exercise of discretion in the application of the principle embodied in Rule 403.

■ The appellant, Ada Carol Thompson, next argues that the trial court erred in granting a directed verdict for the defendants on her claim of infliction of emotional distress. Assuming that the appellant's pleadings properly raised the issue and assuming that reasonable persons could differ as to whether the appellees' conduct was sufficiently outrageous to permit the matter to go to the jury, the trial court was correct in directing a verdict. As appellant concedes, there was no evidence that Carol Thompson suffered a physical injury as the result of witnessing the supposed injury to her son. This is, as appellant concedes, a prerequisite for recovery in this jurisdiction. *Keck v. Jackson*, 122 Ariz. 114, 593 P.2d 668 (1979). We are not at liberty to change a rule that the Supreme Court of Arizona has laid down.

■ There is another reason why we believe that the appellant's claim in this regard should be rejected. Under the facts of this case and the instructions of law given to the jury it is implicit in the verdict

that the jury found that the defendants did not act unreasonably. One may perform a duty knowing full well that it will result in severe distress to others and if the same is not done unreasonably conduct cannot be said to be extreme and outrageous to the point where it would justify a verdict for the infliction of emotional distress. Thus, we view the jury's verdict as having rendered this issue moot.

■ The appellants' final argument is that the trial court erred in directing a verdict in favor of the defendant Dr. Jon R. Hillegas. The appellant argues that Dr. Lipsky called Dr. Hillegas, the vascular surgeon, while Michael Jessee was in the emergency room at Boswell Hospital. He argues that Dr. Lipsky *should* have advised Dr. Hillegas of the results of his examination and what he knew concerning the patient and that *if* he had told Dr. Hillegas the status of the patient Dr. Hillegas should have come and examined him. Dr. Hillegas did not come to the hospital although there is an entry on the hospital chart based upon his advice to the effect that "Patient transferable when blood pressure stabilized." The appellants' argument, on its face, contains the seeds of its own destruction. The record on the plaintiffs' case is silent as to what Dr. Lipsky said to Dr. Hillegas and, except for the entry on the chart, what Dr. Hillegas said to Dr. Lipsky. The reasonableness of Dr. Hillegas' conduct under these circumstances would require expert testimony as to the standard of care and, since there is no foundation on which such expert testimony could be based, it was not error to direct the verdict. The proffered testimony of a nurse to the effect Dr. Hillegas refused to come to the hospital was properly excluded because it was totally without foundation.

Appellant urges that the jury might have concluded that the action of the hospital and the emergency room physician in transferring Michael Jessee was reasonable *because* Dr. Hillegas would not come to the hospital. This is simply too thin an argument when the entire record is considered. There was extensive evidence during the defense case concerning the conversation between Dr. Hillegas and the emergency room physician including testimony that Dr. Hillegas was never asked to come to the hospital and never refused to come. It was undisputed that it would have taken him longer to get to Boswell Hospital than it did take to transport Michael Jessee to county hospital. It was not error to direct the verdict for Dr. Hillegas.

■ The appellee Hillegas requests attorney fees on appeal because the appeal is frivolous. We agree that the appeal, as to appellee Hillegas, is frivolous. Pursuant to Rule 25, Ariz.R.Civ.App.P., we award a penalty in the amount of $500 against appellant and her counsel in favor of appellee Hillegas.

OGG, P.J., and CORCORAN, J., concur.