688 P.2d 605

Ada Carol THOMPSON, on behalf of herself and as next friend of Michael Jessee, a minor child, Plaintiffs-Appellants,

v.

SUN CITY COMMUNITY HOSPITAL, INCORPORATED, an Arizona corporation, d/b/a Walter O. Boswell Memorial Hospital; Jon R. Hillegas, M.D.; Steven J. Lipsky, M.D.; Emergency Room Physicians, Inc., Defendants-Appellees.

No. 16634–PR.

Supreme Court of Arizona, En Banc.

June 12, 1984.

Reconsideration Denied Sept. 11, 1984.

598

Robert Stephan, Jr., P.C. by Robert Stephan, Jr., Phoenix, for plaintiffs-appellants.

Weyl, Guyer, MacBan & Olson by Kenneth C. Weyl, Thomas G. Bakker, Phoenix, for defendant-appellee Boswell Memorial Hospital.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Harding B. Cure, Larry L. Smith, Phoenix, for defendants-appellees Steven J. Lipsky, M.D. and Emergency Room Physicians, Inc.

Snell & Wilmer by John J. Bouma, Robert J. Gibson, Phoenix, for defendant-appellee Jon R. Hillegas, M.D.

FELDMAN, Justice.

Ada Carol Thompson (plaintiff) petitioned for review of the decision of the court of appeals. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and Ariz.R.Civ. App.P. 23, and granted review to clarify the law in Arizona regarding (1) the duty of a general hospital to provide emergency care and (2) the relationship between causation and the "loss of a chance" in the law of torts. A detailed version of the facts is set forth in *Thompson v. Sun City Community Hospital, Inc.*, 142 Ariz. 1, 688 P.2d 647 (App.1983). The following brief summary will be supplemented as necessary for a determination of the legal issues involved.

Michael Jessee, plaintiff's son, was injured on the evening of September 4, 1976. Jessee was 13 years old at the time of this accident. He was rushed by ambulance from the place of the accident (Wittman, Arizona) to the Boswell Memorial Hospital operated by Sun City Community Hospital, Inc. (Boswell) in Sun City. Among Jessee's injuries was a transected or partially transected femoral artery. The injury was high in the left thigh and interrupted the flow of blood to the distal portion of the leg. Upon arrival at the emergency room·

at 8:22 p.m., Jessee was examined and initially treated by Dr. Steven Lipsky, the emergency room physician. Fluids were administered and blood was ordered. The leg injury prompted Dr. Lipsky to summon Dr. Alivina Sabanas, an orthopedic surgeon. She examined Jessee's leg and determined that he needed surgery. Dr. Jon Hillegas, a vascular surgeon, was consulted by phone.

At some time after 9:30 p.m. Jessee's condition "stabilized" and the decision was made to transfer him to County Hospital. There is no clear indication in the record of *who* ordered the transfer. Dr. Lipsky determined that Jessee was "medically transferable" but stated that "Michael Jessee was transferred for economic reasons after we found him to be medically transferable." Dr. Lipsky had no authority to admit patients to Boswell. Dr. Sabanas, who did have such authority and who knew that Jessee needed vascular surgery, claimed that Jessee was transferable from an orthopedic standpoint. Dr. Hillegas told Dr. Lipsky that Jessee could be transferred when "stabilized." A witness for the plaintiff testified that "The doctor at Boswell [apparently Dr. Lipsky] said [to Ada Thompson], 'I have the shitty detail of telling you that Mike will be transferred to County....'" A Boswell administrator testified that emergency "charity" patients are transferred from Boswell to County whenever a physician, in his professional judgment, determines that "a transfer could occur."

Thus, at 10:13 Jessee was discharged from the Boswell emergency room, placed in an ambulance, and taken to County. The doctors who attended to him at County began administering fluids and ordered blood. They testified that Jessee's condition worsened but that he was eventually "stabilized" and taken to surgery at about 1:00 a.m. Jessee underwent abdominal surgery and, immediately thereafter, surgery to repair his torn femoral artery. He survived but has residual impairment of his left leg. His mother, as *guardian ad litem,* brought a malpractice action against Boswell and the physicians.

The trial, hard fought and sometimes acrimonious, lasted three weeks. The trial record reveals a confusion of the issues of duty of care and causation. In any case such as this there are two types of causation questions. The first, relating to the question of breach of duty, pertains to the cause for the transfer to another hospital. Was the patient transferred for medical or other reasons? The second question relates to the cause of injury and is concerned with whether the transfer, with its attendant movement and delay, caused a new or additional injury or aggravated any injury which already existed. The first question was answered by defense counsel in chambers, prior to any testimony being taken in the case:

> We admit and stipulate that the plaintiff in this case was transferred from Boswell to County Hospital for financial reasons. There is no question about it.

This stipulation was prompted by a record which clearly indicates that the transfer was made because the type of insurance available for the patient did not satisfy the hospital's financial requirements for admission.

Thus, as soon as he became "medically transferable," Jessee was transferred because he lacked the necessary financial standing and not because surgery at County Hospital could be performed more quickly or by a more skilled surgeon. Nevertheless, there was some testimony at trial that other factors involved in "medical transferability" might have had some influence on the decision to transfer—e.g. the claim that County was better prepared to take a patient immediately into emergency surgery. The court gave the following jury instructions

> Now, Defendant Boswell Hospital is a private hospital and as such may establish its own eligibility requirements regarding ability to pay. It does have a duty to provide immediate and necessary emergency care to all persons regardless of ability to pay. The hospital may properly determine a patient's eligibility ac-

cording to its own rules before admitting a patient as an in-patient for further definitive treatment, and may transfer a patient to another appropriate hospital if the patient is medically transferable.

A patient is medically transferable when in the judgment of the staff or emergency physician the patient may be transferred without subjecting the patient to an unreasonable risk of harm to his life or health.

Plaintiff claims that under the facts of the case at bench, these instructions misstate the law to be applied in Arizona. Therefore, we address the following issues:

(1) Did the instruction set forth the proper standard of care for emergency services?

(2) If not, did the trial court err in refusing to affirmatively instruct the jury that the defendant hospital had breached its duty of care? Put differently: Should the trial court have ruled, as a matter of law, that the transfer was a breach of duty which the hospital owed its patient?

(3) Did the trial court err in failing to instruct the jury properly on the issue of causation?

## THE STANDARD OF CARE

### The Hospital

In this state, the duty which a hospital owes a patient in need of emergency care is determined by the statutes and regulations interpreted by this court in *Guerrero v. Copper Queen Hospital*, 112 Ariz. 104, 537 P.2d 1329 (1975). Construing the statutory

1. The history of the legislation regarding health care shows a clear intent to provide quality health care, especially emergency care, to all. The Legislature stated their intent as follows:
 The legislature intends that the department of health services established by this act shall be able to provide or promote:
 1. Quality health care, in coordination with the private sector of health providers, to the citizens of this state.
 \* \* \* \* \* \*
 4. Necessary health services for medically dependent citizens of this state.
 5. Essential health care services, including but not limited to, emergency medicine....

and regulatory scheme governing health care and the licensing of hospitals as of 1972, we held that it was the "public policy of this state" that a general "hospital may not deny emergency care to any patient without cause." *Id.* at 106, 537 P.2d at 1331.

In *Guerrero*, we referred primarily to former A.R.S. § 36-405(A) in construing the statutes governing the licensing of hospitals. *Id.* We then referred to specific regulations promulgated under the authority of that statute. *Id.* at 106 n. 1, n. 2, 537 P.2d at 1331 n. 1, n. 2. Subsequently, as a part of a general rewriting of title 36 in 1973, the Director of Health Services was required to adopt regulations for the licensure of health care facilities. A.R.S. § 36-405.[1]

As guidelines for minimum requirements, the director was mandated to use the standards of the Joint Commission for Accreditation of Hospitals (JCAH). A.R.S. § 36-405(A). Several of the JCAH requirements are set out at length in the opinion of the court of appeals (142 Ariz. at 6-7, 688 P.2d at 652-653). The emergency services section of the JCAH states that:

> no patient should arbitrarily be transferred if the hospital where he was initially seen has means for adequate care of his problem.

JCAH, *Accreditation Manual for Hospitals* 69 (1976). The "Patient's Rights" section of the JCAH manual makes it clear that the financial resources of a patient are among the "arbitrary" considerations with-

\* \* \* \* \* \*
7. Compliance with standards in licensing of health facilities.
Historical Note, § 36-101, 11A A.R.S. One of the problems the legislature intended to address was the "depth of public concern" regarding "[d]ifficulty in getting care after hours and in emergencies." ("Consultant's Report to the Joint Select Committee on Health Services" [by Dr. Paul F. O'Rourke], "received by official action of the Committee" on January 17, 1973, at 48-50).

in the contemplation of the above language:

> no person should be denied impartial access to treatment or accomodations that are available and *medically indicated,* on the basis of such considerations as . . . the nature of the source of payment for his care.

*Id.* at 23 (emphasis supplied).

██ Principles governing the functioning of hospitals were not left in the abstract. Specific regulations were adopted and in 1976, A.C.R.R. R9–10–248, concerning "emergency departments," provided that "general hospitals shall provide facilities for emergency care." In addition, such hospitals were required "to have on call one or more physicians licensed to practice medicine and surgery in Arizona or resident physician or intern physician." [2] Our holding in *Guerrero* is reinforced by A.R.S. § 41–1837(A). This statute is of particular relevance in understanding the entire legislative scheme bearing on the issue of emergency care. It reads as follows:

> A. When an indigent emergency medical patient is received by an emergency receiving facility from a [licensed] ambulance . . ., the county shall be liable pursuant to § 11–297.01, to the ambulance service for the cost of transporting the patient and to the facility for the reasonable costs of all medical services rendered to such indigent by the facility

until such patient is transferred by the county to the county hospital, or some other facility designated by the county.

The quoted statute was in effect in 1975 when we decided *Guerrero* and is still in effect. It provides the answer to a serious problem. Charging hospitals with a legal duty to render emergency care to indigent patients does not ignore the distinctions between private and public hospitals. Imposition of a duty to render emergency care to indigents simply charges private hospitals with the same duty as public hospitals under a statutory plan which permits reimbursement from public funds for the emergency care charges incurred at the private hospital.

██ This legislative and regulatory history provides no reason to retreat from or modify *Guerrero.* We therefore affirm its holding that, as a matter of public policy, licensed hospitals in this state are required to accept and render emergency care to all patients who present themselves in need of such care. The patient may not be transferred until all medically indicated emergency care has been completed. This standard of care has, in effect, been set by statute and regulation embodying a public policy which requires private hospitals to provide emergency care that is "medically indicated" without consideration of the economic circumstances of the patient in need of such care.[3] Thus, the word "cause"

**2.** The current regulation, which replaced R9–10–248, is R9–10–218. Although not in effect in 1976, it is useful in understanding the past intent of providing health care to emergency patients. It specifically requires all general hospitals to render "necessary emergency medical services . . . to any person in need of them." We do not view this as a change in the law, but simply as administrative adoption of the law as we construed it in *Guerrero.*

**3.** Although the *Guerrero* decision was based on statutory grounds rather than the common law doctrine enunciated in *Wilmington General Hospital v. Manlove,* 54 Del. 15, 174 A.2d 135 (1961), this court noted that the public policy concerns embodied in the Arizona statutory scheme are consistent with the following passage from *Manlove:* "If a person, seriously hurt, applies for . . . aid at an emergency ward . . . a refusal might well result in worsening the condition of

the injured person, because of the time lost in a useless attempt to obtain medical aid." *Guerrero,* 112 Ariz. at 105, 537 P.2d at 1330 (quoting *Manlove,* 174 A.2d at 139). The policy which underlies the statutory duty of care should not be confused with the factual question of whether the refusal of emergency care is a cause in fact of the plaintiff's subsequent harm. Once this distinction between duty and cause is made, it can be seen that the court of appeals' reliance on *Harper v. Baptist Medical Center-Princeton,* 341 So.2d 133 (Ala.1976) is misplaced. *Harper* does indeed present a factual situation nearly identical to the case at bench. However, in Alabama a private hospital has no duty to provide care to an emergency patient. *Harper,* 341 So.2d at 134; *Birmingham Baptist Hospital v. Crews,* 229 Ala. 398, 157 So. 224 (1934). Given the antithetical legal principles in Alabama and Arizona regarding the issue of the duty of hospi-

used in the quoted portion of *Guerrero* refers to something other than economic considerations. *See Hiser v. Randolph,* 126 Ariz. 608, 611, 617 P.2d 774, 777 (App. 1980). Interpreting the standard of care in accordance with the public policy defined in *Guerrero,* we hold that reasonable "cause" for transfer before completion of emergency care refers to medical considerations relevant to the welfare of the patient and not economic considerations relevant to the welfare of the hospital. A transfer based on the forbidden criterion of economic considerations may be for the convenience of the hospital but it is hardly "medically indicated."[4] Given the duty imposed in Arizona—that a general hospital may not deny emergency care to any person without valid cause—there are three possible defenses a hospital may raise in an appropriate fact situation: (1) that the hospital is not obligated (or capable) under its state license to provide the necessary emergency care, (2) there is a valid medical cause to refuse emergency care, (3) there is no true emergency requiring care and thus no emergency care which is medically indicated.

■ Neither of the first two defenses are at issue under the facts of this case. The third is more troublesome. Many people who enter the doors of an emergency room do not truly require "emergency care." The statutes and regulations do not apply to those who go to an "emergency room;" they apply to those in need of "emergency care." What constitutes an emergency is a matter of some disagreement. There are various definitions;[5] the need for immediate attention seems to be the common thread. Ordinarily it is for the jury to determine the factual question of the duration of an emergency and the treatment modalities that are a necessary component of emergency care.

■ Given the stipulation that Boswell ordered the transfer of Jessee to County Hospital because of financial reasons, the relevant inquiries in the case at bench did not relate to "stabilization" and "transferability," but rather to the nature and duration of the emergency. The question was whether, before transfer, the hospital had rendered the emergency care medically indicated for this patient. The facts of this case indicate that emergency surgery was indicated for Jessee. Dr. Hillegas testified that "once the diagnosis is made, you should move on with definitive treatment," and that "you want to repair the arterial

---

tal to render emergency care, *Harper* cannot be considered "the case most clearly on point" (142 Ariz. at 8, 688 P.2d at 654) with the case at bench.

4. Trial testimony of several physicians that transfer based on the indigency of an emergency patient was a common practice among private hospitals in the Phoenix area in 1976 is, therefore, only probative of a negligent custom. *See The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.) *cert. denied sub. nom. Eastern Transportation Co. v. Northern Barge Corp.,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932). *Harris v. Groth,* 99 Wash.2d 438, 663 P.2d 113 (1983); *Helling v. Carey,* 83 Wash.2d 514, 517, 519 P.2d 981 (1974). *See generally,* Prosser, *supra* at 167–68.

Once Boswell stipulated that the transfer was based upon plaintiff's lack of economic resources, proof of professional custom to establish the standard of care was irrelevant because that custom embraced an erroneous view of the applicable legal standard. Thus, testimony that the economically motivated transfer in the case at bench might have been beneficial to the patient (because, e.g., County Hospital had a surgi-

cal team that could assemble more rapidly) was relevant to the question of the causation of damage but not to the question of the propriety of the transfer. The latter issue was resolved by the stipulation.

5. *Dictionary definition:* An emergency is an unforeseen combination of circumstances or the resulting state that calls for immediate action ... as a: a pressing need ... b: a sudden bodily alteration such as is likely to require immediate medical attention .... Webster's Third New International Dictionary at 741 (1965).

*Trial Court definition in jury instructions:* An emergency is an unforeseen combination of circumstances creating a condition which in the professional judgment of a physician and surgeon of good standing acting under the same or similar circumstances requires immediate care, treatment or surgery in order to protect a person's life or health.

*Statutory definition of an "emergency medical patient:* "a person who is suffering from a condition which requires immediate medical care or hospitalization, or both, in order to preserve the person's health, life or limb." A.R.S. § 41–1831(7).

injury just as soon as you can." Dr. Lipsky knew Jessee needed surgery. Dr. Sabanas believed Jessee needed emergency surgery. Dr. Krigsten, an orthopedic surgeon called to testify on behalf of Dr. Sabanas, believed it would have been advantageous for two surgical teams to have worked simultaneously on Jessee at County Hospital in order to promptly revasculate the leg. Plaintiff's experts were even more insistent on the need for emergency surgery. Thus, the judge's view that the patient's condition was one requiring emergency care which included surgery to repair a transected artery was clearly supported by the evidence in addition to the defendant's concessions on this issue.[6] Given this view of the case it was error for the trial judge to refuse plaintiff's request for a peremptory instruction on the issue of the hospital's breach of its duty of care. The undisputed evidence established that the patient was transferred for financial reasons while emergency care was medically indicated. As a matter of law this was a breach of the hospital's duty. Thus, the only question before the jury on the issue of the hospital's liability was whether its breach of duty was a cause of some compensable damage.

### The Physicians

■ The duty of care owed by a physician to a patient is different from the hospital's duty. No statute requires the physician to provide services separate and apart from those which the hospital is required to provide. Thus, the duty of care owed by a physician is determined by common law principles which require reference to that which is usually done by members of the profession.[7] It is distinct from the hospital duty. *Hiser v. Randolph, supra.* Plaintiff argues that the instructions given by the court concerning the standard of care applicable to Dr. Lipsky was incorrect because it permitted a finding that a patient is "medically transferrable when in the judgment of the staff or emergency physician, the patient may be transferred without subjecting [him] to an unreasonable risk of harm." Plaintiff argues that the test is not the individual judgment of the physician, but the judgment of the community of physicians, and contends that the interjection of the subjective element was error.

■ We agree. However, we believe this argument misses the issue. Dr. Lipsky was not a specialist in either orthopedic or vascular surgery. He was an emergency room physician. Even if qualified, he could not have performed the needed surgery unless Jessee had been admitted. Lipsky had no power to admit and could not have admitted Jessee if he had wanted to do so. So far as this record shows, he did not make the decision to transfer and did not advocate transfer. Dr. Lipsky is not accused of having fallen below the standard of care with respect to the treatment which he personally gave to Jessee. In fact, the entire thrust of this case is that Jessee was injured by the failure to admit

6. The following statements were made in chambers during a conference to settle jury instructions:

THE COURT: All of the evidence is, and it is true and it is a fact, that this was an emergency case. There's no issue [whether] that guy was an emergency. That's why they hauled him red light to County. There's no question about that.

[This was followed shortly by a concession from defense counsel:]

[HOSPITAL'S COUNSEL]: I think your Honor, as I look back again, I would suggest, I would like to withdraw [the emergency issue from the instruction] and suggest removing it because there isn't any issue whether he was in an emergency. As you said, he was in an emergency. We all agree to it.

So, probably, it isn't necessary to have a jury instruction about what an emergency is.

[PHYSICIAN'S COUNSEL]: If [plaintiff's counsel] wants to get up and argue if the patient is an emergency, he shouldn't be transferred, nobody has said that. It's just going to be an attempt to confuse the jury between the emergency room care and definitive care admission. There's no question about whether this patient was an emergency. He was.

7. In this connection, however, see the American Medical Association's Principles of Medical Ethics, VI (revision of 1980); *Cf. Hiser v. Randolph,* 126 Ariz. at 611, 617 P.2d at 777.

and the consequent delay in repair of his transected femoral artery. Jessee was refused admission because of hospital policy. Nothing in the record indicates that any act or omission of Dr. Lipsky was a cause of the refusal to admit Jessee or the transfer to County Hospital. Therefore, we find that the instruction on the physician's duty of care was, at most, harmless error. The judgment entered on the verdict for Dr. Lipsky is affirmed.

■ The trial court directed a verdict in favor of the vascular surgeon, Dr. Hillegas. The court of appeals found no error. We agree. Plaintiff argues, however, that the vascular surgeon breached his duty in failing to come to the hospital to attend Jessee, and is liable under the principles set forth in *Hiser v. Randolph, supra.* We disagree. In *Hiser* the hospital did not have a physician on duty in the emergency room. Several local physicians were "on call" to come to the emergency room to render emergency care. By assenting to the hospital bylaws, rules and regulations these physicians "personally became bound" to come to the emergency room when called. The doctor in *Hiser* was called to the emergency room to treat a patient in a diabetic coma and flatly refused to fulfill his obligation.

In the case at bench, physicians were on duty and present at Boswell to care for emergency patients; specialists were "on call," prepared to come to the hospital and treat patients who needed specialized attention. Dr. Hillegas was one of the latter. Unlike the hospital in *Hiser*, Boswell did not request this physician to come. To the contrary, Boswell's refusal to admit Jessee would have made Dr. Hillegas' arrival at the hospital an empty gesture. We find no error in the directed verdict in favor of Dr. Hillegas.

■ The court of appeals assessed a penalty, finding that the appeal with respect to Dr. Hillegas was frivolous. A frivolous issue is one that "indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit." *Evans v.*

*Arthur,* 139 Ariz. 362, 678 P.2d 943, 944 n. 1 (1984), quoting from *Price v. Price,* 134 Ariz. 112, 114 n. 1, 654 P.2d 46, 48 n. 1 (App.1982). As a whole, neither the action nor the appeal were frivolous. The appeal as to Dr. Hillegas, based on the holding in *Hiser,* was not well taken because factual distinctions make *Hiser* inapposite. However, prior to today's decision plaintiff's position was one about which reasonable attorneys could disagree. It was, therefore, not frivolous under our rule in *Evans v. Arthur, supra.* We vacate the penalty assessed by the court of appeals.

## CAUSATION

Boswell's theory of the case was that the breach of duty, if any, in transferring the patient had caused no damage, since Jessee's serious injuries might have led to precisely the residual injury which he did sustain. At defendant's request, the court instructed the jury that plaintiff could not recover absent proof of a probability that the acts or omissions of the defendant had aggravated the original injury. Plaintiff sought an additional instruction that such cause was established if plaintiff had proved that defendant's acts or omissions had "increased the risk of harm" to plaintiff. The requested instruction was based on *Restatement (Second) of Torts* § 323. The court refused the instruction, and that refusal was approved by the court of appeals, 142 Ariz. at 10, 688 P.2d at 656, on the authority of *Hiser v. Randolph, supra. Hiser* held that proof of the loss of a chance of recovery—the "increase in the risk of harm"—established only a possibility of causation.

> In this jurisdiction the tortious act of malpractice must be shown to have been the probable and not merely the possible cause of death or other untoward results.

126 Ariz. at 612, 617 P.2d at 778.

Arguing that it represents a minority position, plaintiff asks that we examine the *Hiser* principle. We acknowledge the difficulty in resolving the question of causation in cases where defendant has negligently

breached an undertaking to prevent a certain harm. In such situations we must often speculate whether the same harm might have occurred even if defendant had acted with due care. *Hicks v. United States*, 368 F.2d 626, 632–33 (4th Cir.1966). Historically, courts have been liberal with the causation issue in such cases and have allowed the jury to decide whether defendant's breach of duty was a cause or substantial factor in the final result. *See* Prosser, *Law of Torts* § 41, at 242–43 (4th ed. 1971); Malone, *Ruminations on Cause-In-Fact*, 9 Stan.L.Rev. 50 (1956).[8] In malpractice cases, this battle over the resolution of the causation issue has been waged most fiercely. *See Cooper v. Sisters of Charity of Cincinnati, Inc.*, 27 Ohio St.2d 242, 272 N.E.2d 97 (1971) (the case relied upon in *Hiser*); *see also* Malone, *supra*, at 81.

Generally, two different rules have evolved. The first holds that the plaintiff must introduce evidence from which the jury may find a probability that because of the defendant's negligence the ultimate result was different from or greater than that attributable to the original injury or condition. Under this rule the issue of causation is taken from the jury if plaintiff fails to carry this evidentiary burden. *His-*

*er, supra; Cooper, supra; Hanselmann v. McCardle*, 275 S.C. 46, 267 S.E.2d 531 (1980). Even *Hiser* reminds us, however, that the rule is one of substantive law and not one of evidence. The plaintiff may introduce evidence with regard to possibilities, so long as the overall weight of the evidence permits a finding of probability, thus enabling the plaintiff to carry the substantive burden of proof on the issue of causation. *Hiser*, 126 Ariz. at 612, 617 P.2d at 778; *see also Saide v. Stanton*, 135 Ariz. 76, 79 n. 1, 659 P.2d 35, 38 n. 1 (1983). Under this rule, plaintiff fails in his burden of proof and a verdict is directed if the evidence does not warrant a finding that the chance of recovery or survival absent defendant's negligence, was over 50%.[9]

Under the second rule, even if the evidence permits only a finding that the defendant's negligence increased the risk of harm or deprived plaintiff of some significant chance of survival or better recovery, it is left for the jury to decide whether there is a probability that defendant's negligence was a cause in fact of the injury. *Restatement (Second) of Torts*, § 323; *Hicks v. United States, supra; Herskovits v. Group Health Cooperative of Puget Sound*, 99 Wash.2d 609, 664 P.2d 474 (1983) (see especially, the concurring opin-

---

**8.** Malone cites several cases which provide excellent examples of the broad view of causation where defendant's negligence consists of the breach of a duty to protect the plaintiff from a particular peril. *See e.g. Kirincich v. Standard Dredging Co.*, 112 F.2d 163, (3d Cir.1940) (causation was for the jury where defendant failed to provide a safety rope that might have prevented the deceased seaman from being washed overboard); *Rovegno v. San Jose Knights of Columbus Hall Association*, 108 Cal.App. 591, 291 P. 848 (1930) (although it would largely be a matter of speculation or inference, the jury and not the court must decide whether defendant's failure to provide a lifeguard at a public swimming pool was a cause of plaintiff's death when plaintiff might have drowned even had there been a lifeguard); *Burt v. Nichols*, 264 Mo. 1, 173 S.W. 681 (1915) (jury must decide whether defendant's failure to provide fire safety appliances was a cause of the loss of plaintiff's building, which might have burned anyhow); *DiNicola v. Pennsylvania R.R.*, 158 F.2d 856 (2d Cir.1946) (failure to turn ship back to attempt rescue of lost seaman); *Zinnel v. United States Shipping*

*Board Emergency Fleet Corp.*, 10 F.2d 47, 49 (2d Cir.1925) ("we cannot say that there was no likelihood that a rope ... would not have saved the seaman").

**9.** "[T]he mere loss of an unspecified increment of the chance for survival is, of itself, insufficient to meet the standard of probability." *Hiser*, 126 Ariz. at 613, 617 P.2d at 779. The same rule is followed by some courts even when there is a loss of a specified increment of chance, not exceeding 50%. *See, e.g., Cooper v. Sisters of Charity*, 27 Ohio St.2d at 253, 272 N.E.2d at 104, holding testimony that "there certainly is a chance and I can't say exactly what—maybe some place round 50%" that the patient would have survived had the doctor not been negligent, combined with testimony from another doctor of "maybe—around 50%" chance of survival, was insufficient to create a jury issue on causation. The "words in the context used, could mean either more than 50% or less than 50%. Probable is more than 50% of actual." *Id.*

ion of Pearson, J., carefully reviewing a number of cases on this issue and weighing the policy considerations involved. *Id.* 664 P.2d at 478 *et seq.*); King, *Causation, Valuation and Chance in Personal Injury Torts Involving Pre-existing Conditions and Future Consequences,* 90 Yale L.J. 1353 (1981). The meaning of the rule was explained in *Hamil v. Bashline (Bashline I)*, 224 Pa.Super. 407, 417, 307 A.2d 57, 62 (1973), where the Pennsylvania Superior Court stated:

The defendant is not, under Section 323 [Restatement (Second) of Torts,] liable merely for having increased the risk of death, but the evidence of the increased risk of death is ... for the jury's consideration on the factual issue whether the death was caused by defendant's failure to use reasonable care.

This position was approved by the Pennsylvania Supreme Court in *Hamil v. Bashline (Bashline II)*, 481 Pa. 256, 273, 392 A.2d 1280, 1288 (1978), in which the court stated:

Once the jury is apprised of the likelihood that defendant's conduct resulted in plaintiff's harm, that [Restatement] Section leaves to the jury, and not the medical expert, the task of balancing probabilities....

In adopting the *Bashline* rationale the Washington Supreme Court stated that:

It is not necessary for a plaintiff to introduce evidence to establish that the negligence resulted in the injury or the death, but simply that the negligence increased the risk of injury or death. The step from the increased risk to [the probability of] causation is one for the jury to make.

*Herskovits v. Group Health Cooperative of Puget Sound,* 99 Wash.2d at 617, 664 P.2d at 478.

There is much to be said against the *Hiser* rule. It puts a premium on each party's search for the willing witness. Human nature being what it is, and the difference between scientific and legal tests for "probability" often creating confusion, for every expert witness who evaluates the lost chance at 49% there is another who estimates it at closer to 51%. Also, the rule tends to defeat one of the primary functions of the tort system—deterrence of negligent conduct because cases based on statistical possibilities the rule prevents any individual in a group from recovering, even though it may be statistically irrefutable that some have been injured. *See* King, *supra* at 1377.

■ The unsatisfactory result from application of the *Hiser* rule is well illustrated by the facts of the case at bench. Defense experts testified that even if the failure to admit caused a delay in vascular surgery, the chances were only 5 to 10% that plaintiff would have achieved complete recovery with prompt surgery. Though unwilling or unable to quantify the chance of complete recovery with prompt surgery, plaintiff's experts testified that there would have been a "substantially better chance" of full recovery had surgery been performed at once. They testified that the longer the delay, the greater the risk of residual injury. Taking cognizance of the principle that the probability rule is substantive rather than procedural, the court left the issue to the jury but refused to instruct under § 323 of the Restatement.[10] We believe the *Restatement* rule, evidently followed by the trial judge here, to be better than the rule adopted by the court of appeals in *Hiser.* We acknowledge that it permits the case to go to the jury on the issue of causation with less definite evidence of probability than the ordinary tort case. To this extent, no doubt, it permits the jury to engage in some speculation with regard to cause and effect. However, the

---

10. This is proper. Having allowed plaintiff the opportunity to present evidence on the possibility that defendant's conduct increased the harm, the trial judge then submitted the case to the jury to weigh this evidence and to make the critical determination of the probability of causation. There was no need for the judge to do more than instruct on the general principles of probability and causation. Specifically, the judge had no obligation to draw the jury's attention to the legal rule which allowed the evidence of possibilities to be introduced and argued.

jury is still instructed that they must find for the defendant unless they find a *probability* that defendant's negligence was a cause of plaintiff's injury. We must remember further, that we are dealing with the limited class of cases in which defendant undertook to protect plaintiff from a particular harm and negligently interrupted the chain of events, thus increasing the risk of that harm. Defendant's negligent act or omission made it impossible to find with certainty what would have happened and thus forced the court to look at the proverbial crystal ball in order to decide what might have been. Such determinations, of course, have traditionally been the province of the jury rather than the judge. *Prosser, supra,* § 42; *Malone, supra,* at 80–81.

We caution that this rule fits only in those situations where the courts traditionally have allowed juries to deal more loosely with causation—the cases where the duty breached was one imposed to prevent the type of harm which plaintiff ultimately sustained. *See* Prosser, *supra,* § 42; Green, *The Causal Relation Issue,* 60 Mich.L.Rev. 543, 556–57, 560 (1962); note 8, *ante.* In the ordinary case the traditional rule prevails. But, where the law governing duty encompassed "the chance interest within [its] range of protection" (and the harm from which defendant was to have protected the plaintiff occurred), greater latitude is given to the trier of fact to find causation under any plausible theory. Malone, *supra* at 81. "Hence the interest which the law is protecting is the *chance* itself, and the chief problem is the evaluation of the chance, which is a function peculiarly within the province of the jury." *Id.* at 80 (emphasis in original). This formulation, of course, merely recognizes that juries often discount damages according to the statistical evidence in order to accurately evaluate the true loss. *Cf. Jordan v. Bero,* 158 W.Va. 28, 210 S.E.2d 618, 640–41 (1974) (Neely, J., concurring).

 We hold, therefore, that because the protection of the chance interest was within the range of the duty breached by defendant and the harm which followed was the type from which the defendant was to have protected the plaintiff, the jury may be allowed to consider the increase in the chance of harm on the issue of causation. If the jury finds that defendant's failure to exercise reasonable care increased the risk of the harm he undertook to prevent, it may from this fact find a "probability" that defendant's negligence was the cause of the damage.

We therefore disapprove of *Hiser* on this issue and adopt the rule of *Restatement (Second) of Torts* § 323 in Arizona.

> One who undertakes, . . ., to render services to another which he should recognize as necessary for the protection of the other's person or things, is *subject to liability* to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, . . . .

(emphasis supplied). This rule, of course, is not a subject of instruction; it is for the court. That defendant is "subject to liability" means that the issue of causation may go to the jury upon proof of increase in the risk of harm. The jury is left to decide the issue of probability.

## OTHER ISSUES

### Punitive Damages

 The plaintiff argues that the trial court erred in failing to admit evidence on punitive damages and to give a punitive damages instruction. On this record we approve the court of appeals' resolution of the issue, deferring to the trial judge's discretion under Ariz.Rule of Evid. 403, 17A A.R.S. (142 Ariz. at 11, 688 P.2d at 657).

### Emotional Distress

 Plaintiff Thompson maintains that "the facts of this case required modification of the law to allow . . . [her] an opportunity to recover for the severe emotional distress she experienced as a result of defendant's conduct." We disagree. The tri-

al judge's rulings on the theory of intentional and negligent infliction of emotional distress were consistent with the paucity of evidence of "outrageousness" (*see Savage v. Boies*, 77 Ariz. 355, 358, 272 P.2d 349, 351 (1954); *Restatement (Second) of Torts*, § 46 and comment (h) thereto) and the lack of proof of damages to Thompson. Contrary to plaintiff's assertion, on this record the facts provide us with little reason to reconsider our holding in *Keck v. Jackson*, 122 Ariz. 114, 593 P.2d 668 (1979).

The judgments in favor of defendants Hillegas and Lipsky are affirmed. The judgment in favor of Boswell is reversed and the case remanded for further proceedings. The opinion of the court of appeals is vacated in part.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.