29 F.3d 632
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Robert N. JANSON; Patsy J. Janson, on behalf of their
incompetent son, Robert E. JANSON, Plaintiffs-Appellants,
v.
Fred K. CHRISTENSEN, M.D.; Robert J. Dunn, M.D.,
Defendants-Appellees.
 No. 93-15038.
 United States Court of Appeals, Ninth Circuit.
 Submitted June 16, 1994.*
Decided June 22, 1994.
 
 Before: GOODWIN, PREGERSON, and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 OVERVIEW
 
 2
 Robert N. Janson and Patsy J. Janson appeal the District Court's decision to grant the Appellees' motion for a directed verdict on behalf of the Appellant Robert E. Janson, their incompetent son. This medical malpractice tort claim was brought in the District Court pursuant to 28 U.S.C. 1332(a)(1), based on diversity of citizenship. We have jurisdiction pursuant to 28 U.S.C. 1291. We affirm.
 
 BACKGROUND
 
 3
 Appellant Robert E. Janson, son of Robert N. and Patsy J. Janson, was severely injured in a single-car accident on August 15, 1985, when his Volkswagon bus struck a palm tree head-on at a high rate of speed. Janson suffered internal injuries, several broken bones, and a closed head injury. Following the accident Janson was transported to Scottsdale Memorial Hospital, where he received medical care from the Appellee neurosurgeons, Fred K. Christensen, M.D. and Robert J. Dunn, M.D. Janson's prognosis was a 50% chance of survival, with a 50% chance of life in a total vegetative state or with significant neurological disabilities. The doctors believed that there was no chance that Janson would ever return to a normal neurological state.
 
 
 4
 Upon Janson's admission to the hospital, a CAT scan was taken which revealed no hematomas to the brain. A CAT scan taken three days later revealed a subdural accumulation in the left frontoparietal area approximately the size of a quarter, containing approximately 20 cc of fluid. No further follow-up CAT scans were taken until September 16th, at which time the scan showed that the subdural accumulation had increased to approximately four and one-half inches in length and approximately one-fourth inch in thickness. Two days later, Dr. Christensen performed a burr-hole procedure on Janson to drain the accumulation. Following the surgery, Janson was transferred to rehabilitative facilities in Pennsylvania and Ohio. Currently, Janson resides in the Ashtabula County Nursing Home in Ashtabula, Ohio.
 
 
 5
 In March 1988, Janson's parents brought a lawsuit on his behalf, alleging that the Appellants's treatment of Janson's head injury violated the community standard and constituted malpractice under the laws of the State of Arizona, A.R.S. 12-561 et seq. Specifically, the complaint alleged that: "As a direct and proximate result of the defendants' failure to diagnose the severity of the plaintiff's head injury, a subdural hematoma went untreated for one month resulting in extreme and irreversible neurologic damage to the plaintiff."
 
 
 6
 The focus of the November 1992 trial was Dr. Christensen's and Dr. Dunn's care and monitoring of Janson's severe brain injury that resulted from the accident. Both Appellee doctors testified that their conduct complied with the appropriate standard of care, and that even with hindsight, they would not have altered the course of their treatment. Further, Dr. Christensen and Dr. Dunn testified that Janson's current condition was solely the result of the brain injury which Janson suffered in the auto accident, and that Janson's present level of functioning comported with the best prognosis that they had described during their initial examination of Janson after the accident.
 
 
 7
 Through the testimony of neurosurgeon Dr. Julius Wolkin, Janson presented evidence that the Appellees' failure to take a follow-up CAT scan until September 2nd, and to remove the fluid accumulation immediately upon discovery, was conduct which fell below the accepted standard of care for the type of injury which Janson had suffered. Further, Wolkin testified that in his opinion, to a reasonable degree of medical probability, the increased fluid accumulation "could contribute to either mechanically injuring or injury by virtue of changes in the circulation, the arterial circulation, again, by virtue of the pressure and distortion of the brain." In addition, Dr. Wolkin testified that the Appellee's failure to take a follow-up CAT scan increased the risk of harm to Janson and denied Janson a chance for a better recovery.
 
 
 8
 Janson than called to the witness stand neurosurgeon Dr. William B. Helme, who testified that Appellees' delays in taking the follow-up CAT scan and performing the surgery to remove the accumulated fluid violated the medical standard for a reasonably prudent physician. Further, Dr. Helme testified that, to a reasonable degree of medical probability, the increased intracranial pressure would cause damage to the neurons, which would make Janson's already damaged neurons even more vulnerable. Dr. Helme also testified that, to a reasonable degree of medical probability, Janson was deprived of some significant chance of a better recovery.
 
 
 9
 Both Dr. Wolkin and Dr. Helme, however, admitted that they could not quantify the extent of Janson's injuries directly attributable to the negligence of the Appellees. Although both witnesses indicated that the intracranial pressure created by the fluid accumulation could have caused additional brain injury, they were unable to quantify the amount of additional harm Janson suffered which was attributable to the Appellees' conduct, rather than to the accident itself. Moreover, Dr. Wolkin and Dr. Helme indicated that it was Appellees' alleged negligence that made it impossible to say to a reasonable degree of medical certainty what Janson's condition would have been had the negligent treatment not occurred.
 
 ANALYSIS
 
 10
 We review the District Court's grant of a directed verdict de novo. In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 816 (9th Cir.1992). On appeal, our role is the same as the District Court's. McGonigle v. Combs, 968 F.2d 810, 816 (9th Cir.) cert. dismissed, --- U.S. ----, 113 S.Ct. 399 (1992). Thus, "a directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict." Id.
 
 
 11
 Janson contends on appeal that the District Court erroneously granted the motion for a directed verdict for Drs. Christensen and Dunn because Janson could not show the extent, if any, of the injury caused by the Appellees' alleged negligent treatment of Janson. Specifically, Janson contends that the District Court erred in not following the result in Thompson v. Sun City Community Hospital, Inc., 141 Ariz. 597, 688 P.2d 605 (1984) (en banc), which Janson contends precludes a directed verdict for Appellees. Janson argues that Thompson, which provides a remedy where the injury involved is the "loss of a chance" of better recovery, is "on all fours" with the case at bar.
 
 
 12
 Drs. Christensen and Dunn argue, however, that Janson's reliance on Thompson is misplaced. Although Thompson allows recovery in medical malpractice cases for a victim's "lost chance" of recovery under certain circumstances, Appellees contend that those circumstances were not present here. Appellees argue that Janson failed to offer legally sufficient evidence of actual injury--which is an element required under Thompson, as well as all other medical malpractice tort cases.
 
 
 13
 Both parties correctly contend that the outcome of the present case is controlled by Thompson, which relies on the rule set forth in Restatement (Second) of Torts Sec. 323.
 
 
 14
 Negligent Performance of Undertaking to Render Services
 
 
 15
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
 
 
 16
 (a) his failure to exercise such care increases the risk of such harm, or
 
 
 17
 (b) the harm is suffered because of the other's reliance upon the undertaking.
 
 
 18
 In Thompson, the Arizona Supreme Court examined the relationship between tort causation and the "loss of a chance" doctrine. Id. at 599; 607. Applying Sec. 323, the court stated that the loss of a chance doctrine applies where "the evidence permits only a finding that the defendant's negligence increased the risk of harm or deprived plaintiff of ... [a] better recovery, it is left for the jury to decide whether there is a probability that defendant's negligence was a cause in fact of the injury." Id. at 606; 614. The purpose of this rule is to allow the jury, rather than medical experts, to balance the probabilities of recovery in light of the evidence indicating the likelihood that the defendant's conduct resulted in the plaintiff's harm. Id. at 607; 615. Moreover, the Thompson court noted that although this rule would permit the jury to engage in "some speculation with regard to cause and effect," it was necessary where "[d]efendant's negligent act or omission made it impossible to find with certainty what would have happened." Id. at 607-08; 615-16.
 
 
 19
 Based on our careful review of Thompson and the record before us, we find that the District Court did not err in granting Appellees' motion for directed verdict. Although Janson is correct that Thompson allows for the recovery of a lost chance of recovery, Appellees are correct that Thompson does not allow for recovery where there is no evidence that the defendant's negligent conduct resulted in any actual harm. Thus, although Janson presented sufficient evidence to show negligence on the part of Dr. Christensen and Dr. Dunn, which might have increased the risk of additional injury to Janson, he failed to make any showing that the fluid accumulation in fact caused any injury beyond that already resulting from the auto accident.
 
 
 20
 Our holding does not mean that the plaintiff in future cases involving the "loss of a chance" doctrine must be able to prove with certainty the exact quantity of additional harm caused by the defendant's negligence. Thompson makes it clear that this doctrine is to be used where the defendant's negligence makes it impossible to exactly quantify the harm incurred. Moreover, Thompson makes it clear that the plaintiff need only show that the defendant's negligence "increased the risk of the harm he undertook to prevent" for the jury to find the necessary probability that the defendant's negligence was the cause of the damage. But, there must be some evidence beyond mere speculation that some actual damage resulted from the defendant's negligence. Here, Janson's current condition comports with the best prognosis given in light of the severe injury he received in the accident. In short, if it is impossible for Janson's medical experts to say for certain that some harm did in fact occur, then there is a lack of evidence on which a jury could reasonably reach such a conclusion.
 
 
 21
 AFFIRMED.
 
 
 
 *
 The panel unanimously found this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3