542 P.2d 817

**SAVOCA MASONRY COMPANY, INC.,**
**an Arizona Corporation, Appellant,**

v.

**HOMES AND SON CONSTRUCTION COMPANY, INC., an Arizona Corporation; and Guy Apple Masonry Contractor, Inc., an Arizona Corporation, Appellees.**

**No. 11709.**

Supreme Court of Arizona,
In Division.

Nov. 12, 1975.

Christakis & Rodarte by Charles Christakis, Sev A. Rodarte, Phoenix, for appellant.

Moore & Romley by Craig R. Kepner, Phoenix, for appellee Homes and Son Const. Co., Inc.

Maupin, Wilson & Maud by Harold J. Maupin, Mark E. Aspey, Phoenix, for appellee Guy Apple Masonry Contractor, Inc.

STRUCKMEYER, Vice Chief Justice.

Appellant, Savoca Masonry Company, Inc., brought this action against Homes and Son Construction Company, Inc. and Guy Apple Masonry Contractor, Inc., alleging breach of contract and interference with contractual relationships. The appellees' motions for summary judgments were granted by the Superior Court and this appeal followed.

In testing the suitability of a summary judgment granted by a lower court, we will view the record in a light most favorable to the party opposing the motion. *Peterson v. Valley National Bank of Phoenix,* 90 Ariz. 361, 368 P.2d 317 (1962). When examined in this light, the record establishes that Homes, as general contractor, intended to submit a proposal to the Maricopa County Board of Supervisors for the construction of the Estrella Junior

High School. Savoca Masonry orally submitted a bid to Homes for the masonry work, as it did to ten other contractors who also submitted proposals. Bids were also submitted by other masonry subcontractors, including the appellee, Guy Apple Masonry. In submitting its proposal, Homes used Apple's bid figure, since it was the lowest amount in dollars of those submitted for the masonry work.

The furnishing and installation of precast concrete products is part of the masonry work and was included in both Apple's and Savoca's bids. The bid specifications required that the precast supplier be approved by the county's architect prior to bid time. Mesa Precast was given by Apple as his supplier, but Mesa Precast did not have the county architect's approval. Homes was therefore advised that its precast concrete products supplier was not in compliance with the prior approval clause. Because the supplier had to be changed, it became necessary also to change the masonry contractor and Homes substituted Savoca and its supplier for Apple in its proposal. The change was approved by the architect and Homes was ultimately awarded the contract. On February 28, 1972, Homes informed Savoca that "Your bid is accepted, and you have the job; come pick up the plans."

Three days later, on March 2, 1972, the architect, in an attempt to lower the total overall cost of the job, asked Homes for a cost quotation if the precast concrete products supplier was changed. Homes called Savoca and asked Savoca if it could change its supplier so its bid could be reduced in compliance with the desires of the architect. Savoca informed Homes that it could not because the rules of the Arizona Masonry Association, of which both Savoca and Apple were members, prohibited it. Consequently, Homes then entered into a written contract for the masonry with Apple, who changed his supplier, thereby reducing the cost by $7,213.00. Savoca was informed that it would not get the masonry contract.

Savoca in this suit takes the position that an enforceable oral contract existed between itself and Homes on February 28th at the time it was told "Your bid is accepted," arguing that its bid was an offer and Homes' statement to Savoca was an acceptance. Apple was joined as a defendant in the suit because Savoca asserted an interference with the contractual relationship between Savoca and Homes. Savoca in part relies on the bylaws of the Masonry Association, to which it and Apple belonged, as establishing a contract between them which was breached by Apple. Damages were sought against Homes as having interfered with the Savoca-Apple contract.

■ It is elementary that for an enforceable contract to exist there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained. "A bid is nothing more than an offer to perform a contract for work and labor or supplying materials. . . . It does not ripen into a contract until voluntarily accepted by the offeree." *Universal Construction Company v. Arizona Consolidated Masonry & Plastering Contractors Association*, 93 Ariz. 4, 377 P.2d 1017 (1963). The notification to Savoca that its bid was used, and that it had the job, constitutes an acceptance. Homes does not argue otherwise.

■ Homes argues that there is such a lack of specified material terms that the parties cannot be said to have shown a mutual assent to incur contractual obligations and cites *Plumbing Shop, Inc. v. Pitts*, 67 Wash.2d 514, 408 P.2d 382 (1965). There, a subcontractor submitted an oral bid to a general contractor who was bidding on a government construction project. The general contractor was awarded the contract and informed the subcontractor of that fact.. Discussions were had with the subcontractor on procedures for completing the work and, among other things, the subcontractor submitted a cost breakdown for the work proposed. The general contrac-

tor, however, refused to enter into a written contract with the subcontractor. On appeal after suit, the Washington court said:

"More importantly, *the record before us is devoid of any evidence of agreement, express or otherwise, to any term of the alleged contract other than the price. Such essentials, as manner of payment, time for completion of the mechanical portion of the work, penalty provisions, bonding, etc., are normally critical to any construction contract.* The plaintiff-appellant argues that substantial agreement had been reached on the essential terms, and with respect to such 'housekeeping' items, as time of performance, the law will imply a reasonable time . . . .. But our role is not that of contract maker; we merely give legal effect to bargained-for contractual relations. Any prudent *general contractor,* with the attendant responsibility for coordinating all aspects of a project in order to meet the quality and time requirements of the general contract, probably would require a substantial degree of specificity with respect to time of completion of various portions of the mechanical work in order to insure the overall progress of the project. For that matter, good business practice would dictate that prudent subcontractors (whatever their undertaking) should insist upon precise terms indicating the determinants of, and time for, progress payments and the time for completion of various portions of their undertakings." *Plumbing Shop, supra,* 67 Wash.2d 518–19, 408 P.2d at 384–85. (Emphasis supplied in part.)

■ This is precisely the case here. Only the price and work involved were agreed upon; other provisions which might in the end have proven critical were not. We think important mutual obligations of the parties were still to be agreed upon at the time of the asserted oral acceptance. A sufficient mutual understanding as to all the terms of the contract did not exist. Savoca argues, as did the plaintiff in *Plumbing Shop, supra,* that other "details" can be supplied by custom, usage, and implication. As was there pointed out, the court's role is not that of contract maker. While custom, usage and implications can be used to prove a contract's existence, they cannot be the basis for providing numerous essential elements of an agreement.

Savoca attempts to distinguish *Plumbing Shop* on the grounds that it involved an implied contract and that such is not the case here. If such a distinction exists, it did not play a part in the court's conclusion and for the reasons hereinafter set forth could not possibly influence the ultimate disposition of the instant case.

■ Since we do not find a contractual relationship between Savoca and Homes, there can be no tortious interference with such a contract relationship by Apple.

■ Savoca also argues that Apple was liable for breach of contract because of the Arizona Masonry Association's bylaws. It is its position that when Apple contracted with Homes it violated those bylaws. Unquestionably the bylaws of a voluntary, unincorporated association constitute a contract between the association and its members and the rights and duties of the members as between themselves and in their relation to the association in all matters affecting its internal government and the management of its affairs are measured by the terms of such bylaws. *See Weber v. Marine Cooks' & Stewards' Association of Pacific Coast,* 93 Cal.App.2d 327, 208 P.2d 1009 (1949). We do not think, however, that the Masonry Association's bylaws can be construed to prohibit the conduct complained of here.

■ Savoca points to § 2 of Article 1 of the bylaws, which contains the following provisions:

"Section 2. The purposes of the association are as follows:

(a) To promote ethical principles and practices between and among its membership.

(b) To protect and promote the interests of the masonry industry, and promote good work and thereby increase the esteem and respect of the public in connection therewith."

Savoca also points to § 8 of Article 8, which reads:

"Section 8. Bidding: These procedural rules shall apply to those projects open for bid to two or more General Contractors and controlled by a public bid opening, or a fixed time to accept bids * * *.

(d) Inclusion of bids: A bid should include the work within the plans and specifications for the trade under the craft jurisdiction * * *."

Savoca argues that it would not and could not lower its bid because of the bylaws of the Association. We do not, however, find any language in the foregoing quoted sections which prohibits Savoca from lowering its bid, nor do we agree that this language shows that when Homes and Apple contracted for the same job they violated the bylaws of the Association.

■ Savoca argues that Apple breached the terms of the Association agreement because there is implied in every contract a covenant of good faith dealing, so that neither party may do anything that will injure or destroy the rights or interests of other parties to the agreement. But even a contract implied in fact is dependent upon mutual agreement or consent. As the court said in *Engelbrecht v. Property Developers, Inc.*, 296 N.E.2d 798 (Ind.App.1973):

"We note that even an implied contract requires a meeting of the minds. [Citations]."

Or, as the California Supreme Court said in *Desny v. Wilder*, 46 Cal.2d 715, 299 P. 2d 257 (1956):

"A 'contract implied in fact' requires a meeting of the minds, an agreement, just as much as an 'express contract'; the difference between the two being largely in the character of the evidence by which they are established."

Here, again, we cannot find in the bylaws or elsewhere in the record where there was a meeting of the minds, an agreement, that Apple was prohibited from lowering its bid because of his membership in the Association.

The instant case is similar to *Scott v. Lee*, 208 Cal.App.2d 12, 24 Cal.Rptr. 824 (1962), in that there the California court refused to hold that the bylaws of the Associated Plumbing Contractors of San Mateo County, Inc. gave rise to a contract between its members so that one member could maintain an action against another for failure to abide by the bylaws.

Since we are unable to find any contractual relationship between Savoca and Apple forbidding the changing of a bid to the detriment of another member of the Association, we are unable to say that Apple was liable to Savoca or that Homes was liable for interference with such a relationship.

For the foregoing reasons, the judgment of the Superior Court is affirmed.

CAMERON, C. J., and GORDON, J., concur.