647 P.2d 1182

John Robert CURRIE and Diane Currie, his wife, Plaintiffs-Appellees,

v.

Ray DOOLEY and Betty Dooley, his wife, dba American Towing Company, Defendants-Appellants.

No. 1 CA–CIV 5561.

Court of Appeals of Arizona, Division 1, Department A.

April 27, 1982.

Rehearing Denied June 16, 1982.

Review Denied July 7, 1982.

John D. Lewis, P. C. by John D. Lewis, Tempe, for plaintiffs-appellees.

Foley, Clark & Nye, P. A. by Richard Q. Nye and Daniel C. Turner, Phoenix, for defendants-appellants.

## OPINION

CORCORAN, Judge.

This case involves the liability of a towing company for its refusal to return possession of a car to the owner. We find no basis to reverse the directed verdict of liability or the judgment against the towing company.

Appellants Ray Dooley and Betty Dooley were doing business as the American Towing Company (Towing Company) in Tempe, Arizona. As part of its business, the Towing Company was employed by the owners of the Tempe Shopping Center (Shopping Center) to remove any vehicle parked in the Shopping Center parking lot while the driver was transacting business away from the center. The Shopping Center is adjacent to the campus of the Arizona State University and was often used by students to park their cars while attending class. Vehicles removed from the parking lot were taken to the Towing Company's storage lot and remained there until claimed by the owner. The parking lot was posted with a number of signs to warn and advise drivers that their vehicles could be towed away if they parked in the parking lot other than as customers of the Tempe Shopping Center. The signs read:

> Private parking for Tempe Shopping Center customers only while transacting business herein. Violators will be impounded at vehicle owner's expense. To reclaim vehicle call 969–6602.

On October 2, 1975, appellee John Currie (Currie) parked a 1970 Buick Skylark automobile belonging to his father in the parking lot of the Shopping Center. Currie knew there were signs that authorized use of the parking lot while on business at the Shopping Center, but he had not read one. He parked there to go to school and to purchase an oil pan at one of the stores in the Center to change the oil in another car. He attended his class knowing that by leaving the Center he might be violating his permission to park there. After class Currie purchased an oil pan from the automotive store where his car was parked.

When Currie left the automotive store, an operator for the Towing Company had pulled the car out of its parking place and had hoisted it up onto a dolly preliminary to towing the car away. Currie testified, without dispute, that he asked the operator

what he was doing and the operator indicated that he was preparing to tow the car away. Currie said he would remove the car and the operator said that he would first have to "receive a fee of $25.00 before he would let [him] take it off the lot." Currie did not have $25; he told the operator he would not pay $25 and to put the car down. The operator told Currie that he could call the number on the sign and claim the vehicle later. Currie was not told that there would be additional charges. The operator towed the car away.

Currie telephoned the number on the sign to get his car back and was told by a representative of the Towing Company that "the charges had gone up to $50.48." Currie told her that the price was unreasonable, but she would not negotiate or budge. Currie telephoned his father in Texas who in turn telephoned the Towing Company and requested the return of the car.

Currie retained a lawyer who, by letter dated October 10, 1975, demanded that the car be returned. The demand was not honored by the Towing Company. Currie brought suit shortly thereafter against the Shopping Center and the Towing Company. The Towing Company released the car to Currie in August, 1976, upon payment of $47.25.

The complaint against Tempe Shopping Center was dismissed by the trial court pursuant to a motion for summary judgment. This court upheld the summary judgment. *Currie v. Sechrist*, 119 Ariz. 466, 581 P.2d 700 (App.1978). The court, for the purposes of that appeal, determined that the relationship between the Shopping Center and the Towing Company was that of employer and independent contractor. 119 Ariz. at 469, 581 P.2d at 703.

The following issues are raised on appeal by the Towing Company:

I. Did the trial court err in directing a verdict for Currie on grounds that there was no evidence which would support a jury finding that Currie consented to the towing and storage of his automobile and to pay the charges for those services, thereby giving the Towing Company a lien pursuant to A.R.S. § 33–1022(B)?

II. Was there competent evidence of the value of Currie's car on the date it was towed, or, in the alternative, the reasonable value of the loss of use of the vehicle which would support a jury award of compensatory damages?

III. Was there sufficient evidence that the conduct of the Towing Company was wilful, wanton, or malicious to support a jury award of punitive damages?

We affirm the directed verdict and judgment in regard to these issues.

## I. The Directed Verdict

The statute under which the Towing Company claims a lien provides:

Proprietors of garages, repair and service stations shall have a lien upon motor vehicles of every kind, and the parts and accessories placed thereon, for labor, materials, supplies and storage for the amount of the charges, when the amount of the charges is agreed to by the proprietor and the owner.

A.R.S. § 33–1022(B).

In *Currie v. Sechrist, supra,* this court assumed for the purposes of that appeal that Currie could demonstrate there was "no valid garageman's lien for towing and storage charges under A.R.S. § 33–1022(B) because he [Currie] had not agreed to the charges and had, in fact, demanded the return of his car." 119 Ariz. at 469, 581 P.2d at 703. In the record of this appeal, the only testimony as to what happened at the Shopping Center came from Currie. The tow truck operator did not testify.

■ The key determination to be made is whether a lien attached to the car at any time when it was parked in the Shopping Center parking lot. The only conclusion that can be reached is that no such lien attached on behalf of the Shopping Center or the Towing Company.

The right to a lien for storage costs did not exist at common law. The existence of such a lien is strictly statutory and, being in derogation of the common law,

such a right is entirely conditional on the statutory wording.

*Fitzhugh v. City of Douglas*, 122 Ariz. 599, 600, 596 P.2d 737, 738 (App.1979).

■ The signs posted in the parking lot by the Shopping Center did not create any implied contract since, even if Currie agreed to compensate the Shopping Center, the contract would not have been enforceable because there was no agreement as to the rate of compensation to be paid the Shopping Center or anyone acting on its behalf. *See Savoca Masonry Co. v. Homes & Son Construction Co.*, 112 Ariz. 392, 542 P.2d 817 (1975); *Aztec Film Productions v. Tucson Gas and Electric Co.*, 11 Ariz.App. 241, 463 P.2d 547 (1969). *See generally Osborn v. Boeing Airplane Co.*, 309 F.2d 99 (9th Cir. 1962). Even assuming that the Shopping Center was the "proprietor" referred to in A.R.S. § 33–1022(B), the car was parked in the parking lot and not in a garage, repair or service station. Again, assuming that the Shopping Center as "proprietor" could assign its right to the Towing Company, it would stand in no better position than the Shopping Center. The lien for "storage" only applies to garages, repair, and service stations. Also, as in *Fitzhugh v. City of Douglas, supra*, there was no agreement as to "the amount of the charges" between the "proprietor" and Currie. 112 Ariz. at 600, 596 P.2d at 738. *See also Fields v. Steyaert*, 21 Ariz.App. 30, 515 P.2d 57 (1973).

The Towing Company states in its brief:

A reasonable man could have found Plaintiffs impliedly consented to the towing and storage and impliedly agreed to the amount of charges for storage for their automobile giving American Towing Company a statutory lien and the right to possess the automobile until the charges were paid, entitling a verdict in the favor of Defendants.

However, the record reflects that not only did Currie not agree to pay $25 for "the towing and storage" in the parking lot of the Shopping Center, but that he did not agree to any additional amount of charges for towing the car from the parking lot to some other place of storage. There is no rational way to find that Currie "impliedly consented" to pay monies which he specifically refused to pay. The Towing Company did not have a lien on the car before the conversation with Currie, and it did not secure a lien by virtue of the conversation.

Although the Towing Company stated in its brief that "plaintiffs agreed to pay a reasonable amount for the charges," it is clear that the statutory requirement that there be an agreement as to "the amount of the charges" was not met.

II. *There was evidence to support the verdict and judgment regarding the award of compensatory damages.*

The 1970 Buick Skylark had been purchased by Currie's father for $2,000 nine months before it was towed away. This testimony, along with the other testimony relating to compensatory damages, was uncontroverted by the Towing Company. Currie called an expert witness who had been employed by Avis, National Car Rental, Easy Haul, Dollar-A-Day Rent-A-Car, and Mesa Leasing. He testified that car rental agencies did not rent out 1970 vehicles but gave the following information for rental of a then-current 1975 vehicle: The basic rental rate for a comparable but newer vehicle would be $220 per month, which for 10.8 months equals $2,376. The mileage rate of $.08 per mile at the average of 41 miles per day would be $3.28 per day for 330 days which would total $1,082.40. The expert testified that on the basis of these figures, the total replacement rental was $3,458.40. The jury had returned a verdict for compensatory damages of $2,000 for the loss of the use of the car.

■ The Towing Company sets forth in its brief the following principle of law: "Rental value of other property may be admitted as evidence of the rental value of the specific property converted, but the other property must be *similar* to that of the specific property." Currie agrees with that statement of the principle, and both the Towing Company and Currie cite *Fredenburgh v. Allied Van Lines, Inc.*, 79 N.M.

593, 446 P.2d 868, 875 (1968). The Towing Company, however, asserts that the standard is not met by having an expert testify to the rental value of an automobile which is five model-years newer than the vehicle in question. Our Supreme Court has stated that:

[T]he plaintiff in every case should supply some reasonable basis for computing the amount of damages and must do so with such precision as, from the nature of his claim and the available evidence, is possible.

*Gilmore v. Cohen*, 95 Ariz. 34, 36, 386 P.2d 81, 83 (1963). *See also* Udall, *Arizona Law of Evidence* § 120 at 259 (1960). The expert had testified that as of the time when Currie was deprived of his vehicle there were no auto rental agencies which rented *used* cars. In view of the fact that the jury had before it the cost of the car which was purchased approximately nine months before and the rental cost of a vehicle to replace it for the period of deprivation, there was sufficient evidence of damages to support the jury's verdict.

III. *There was sufficient evidence to support the verdict for punitive damages.*

The Towing Company has claimed a possessory lien on the car under A.R.S. § 33–1022(B) despite the fact that Currie refused to pay the Towing Company its demand and demanded the return of the car from the time it was towed away until it was ultimately returned almost eleven months later.

The Towing Company filed a verified "Report of Stored/Abandoned Vehicle (Sections 28–1401 to 28–1408, A.R.S.)" with the Arizona Department of Transportation dated October 17, 1975. Three of the four questions propounded in the report were as follows:

1. During the period of your possession, has anyone claiming title or rights of possession contacted you or your agents concerning any matters dealing with this vehicle?

3. Do you know the name of the legal owner or lienholder of this vehicle?

4. Are you, or your agents, aware of any other information concerning the owner or any other person claiming any interest in this vehicle?

Each one of these questions was answered "no." The record is clear that Currie and his father claimed possession and title to the car on the same day it was towed away and that shortly thereafter their attorney demanded its return.

The last question propounded by the report was:

2. Has this vehicle been left in your possession under any written or oral agreement for storage, repairs, etc.?

Again, this question was answered "no." Notwithstanding this answer, the position of the Towing Company in the trial court and on this appeal was that it was entitled to a statutory lien on the car because Currie had "impliedly consented" to the towing and storage and had "impliedly agreed" to pay a reasonable amount for the charges incurred by the Towing Company.

As a result of the "Report of Stored/Abandoned Vehicle," the Abandoned Vehicle Section of the Arizona Department of Transportation sent to Currie's father in Texas a "notification of abandoned vehicle" which contained a "notice of intent to sell abandoned motor vehicles." The "notification" indicated that the car had been held by the Towing Company for a period of 15 days and "that no claim was made for the return or possession thereof." The notice advised the father that the car "will be advertised for sale at the expiration of fifteen (15) days from the date of mailing hereof and thereafter will be sold at public auction unless proper claim be made for said vehicle prior to the date of sale." The Towing Company had not advised the Abandoned Vehicle Section of the demands made for the car by Currie, his father or their attorneys, or of the fact that a complaint had been filed in Superior Court the previous month to recover the car. Currie's father wrote to the Abandoned Vehicle Section and informed it that any report indicating the car was aban-

doned was a "false report," that the car was taken without his permission and being held "for ransom," and that he intended to recover the car. The Abandoned Vehicle Section cancelled the abandoned vehicle report since the lawsuit was pending.

The trier of fact could reasonably conclude that misstatements made by the Towing Company, verified by R. E. Dooley, were intentionally untruthful in order to have the Abandoned Vehicle Section issue its "notification" and "notice" thereby allowing the Towing Company to sell the car when it had no right to do so.

The jury would be entitled to view the actions of the Towing Company in the context of its stated policy of doing business. *Southern Pacific Transportation Co. v. Lueck*, 111 Ariz. 560, 535 P.2d 599 (1975), *cert. denied* 425 U.S. 913, 96 S.Ct. 1510, 47 L.Ed.2d 763 (1976). The afternoon of the day on which the car was towed away, Currie's father called the Towing Company, and he testified at trial:

> Well, first of all I asked if they had the car, and they said they did. And I asked why they picked it up and they said that they had been called to the Tempe Shopping Center and they had responded and picked the car up.
>
> I asked what the—had my son attempted to retrieve the car, and it was kind of a one-sided conversation at that time because I didn't get to finish. I talk a little bit slow, I guess; so they would start answering before I'd finish, really.
>
> But in effect I asked what—why they had taken the car and if in fact he hadn't tried to retrieve it. We had a discussion of the charges. I said, asked why they had doubled the charges on him and explained that he was a student at the Arizona State University and was having a hard time of it and trying to make it on his own and that he just didn't have the money, and that I would be glad to see that they got the money if he could get possession of his car, and I'd be willing to pay a reasonable amount for it. But my main interest was that he got the car, because his wife needed the car that her

folks had provided her and that Bob needed his car to go to school.

> And I was told that the only thing that was going to get the car was somebody show up with the cash and that the longer it took for somebody to show up with the case (sic), the more it was going to cost.
>
> When we tried to discuss the per-day cost, I was informed that depended a lot on my attitude. And at that point we had kind of a communications breakdown. I became a little bit concerned because I'm used to handling most situations in my line of work, but I was completely stopped at this one; they were not reasonable in any manner.
>
> And I indicated that we may just have to see a lawyer to get the car back. And they said words to the effect, "Well, trouble is our business. We have a lawyer that handles these for us; we keep him pretty busy; we've never lost a one, so you can pay us now or pay us later; it's up to you."

.     .     .     .     .

> Q At any time in your phone conversation with this gentleman at American Towing, did he offer to compromise his fee or reach an adjustment with you?
> A The only adjustment he discussed was upward.
> Q Would he agree to reduce his fee he demanded at all?
> A Not at all.

Punitive damages can be awarded by a jury "where the conduct of the wrongdoer is wanton, reckless or shows spite or ill will." *Country Escrow Service v. Janes*, 121 Ariz. 511, 513, 591 P.2d 999, 1001 (App. 1979). Punitive damages may be proper in an action for conversion, *Acheson v. Shafter*, 107 Ariz. 576, 578, 490 P.2d 832, 834 (1971), or where a party is dispossessed of his property. The record supports a claim for punitive damages. The verdict and judgment of $2,000 as punitive damages are affirmed.

The judgment entered by the trial court is affirmed.

OGG, P. J., and FROEB, J., concurs.

## ORDER

OGG, Presiding Judge.

The motion for rehearing, response and reply thereto in this matter having been considered by the Court, Presiding Judge Jack L. Ogg and Judges Donald F. Froeb and Robert J. Corcoran participating,

IT IS ORDERED denying the motion for rehearing.

Appellees' request for publication of decision has been considered by the Court. No response to the motion has been filed.

IT IS ORDERED that the decision of this Court herein, which was filed on April 27, 1982, as a memorandum decision, be designated as an opinion rather than as a memorandum decision and be published in the usual course of events.

IT IS FURTHER ORDERED that the clerk of this court is directed to delete the designation "Memorandum Decision" and the parenthetical material following it from the caption of the decision filed on April 27, 1982, and to substitute therefore the designation "Opinion."

IT IS FURTHER ORDERED that copies of this order and of the revised decision be distributed to all persons who receive copies of the original memorandum decision.