BOLICK, J.,
joined by TREBESCH, J., dissenting in part and concurring in the judgment in part.
¶57 The majority today holds unconstitutional statutory changes to the permanent benefit increase (“PBI”) formula and contribution rates as applied to active members of EORP. We respectfully dissent from the holding that changes to contribution rates are unconstitutional and otherwise concur in the result.
¶58 This case involves an anomaly that is largely this Court’s invention. Most Arizona state employees are at-will employees. EORP’s active members are either elected officials or judges who serve for fixed terms. No formal contract exists between the state and those employees. However, in a work of legal fiction to which the likes of John Gris-ham could only aspire, this Court fifty-one years ago implied such a contract for purposes of pension benefits, whose terms are largely set upon the employment date and whose benefits extend far beyond retirement until the employees’ beneficiaries pass on. *50 See Yeazell, 98 Ariz. at 117, 402 P.2d at 546. The voters subsequently incorporated much of that legal relationship into our Constitution. Ariz. Const, art. 29, § 1. We are impelled by that law to agree with the majority that the change in the PBI formula is impermissible. But by freezing employee contribution rates in perpetuity, the majority goes far beyond anything contemplated by our jurisprudence or the Constitution, thereby jeopardizing the Plan’s financial integrity, imposing an enormous uncontemplated burden on taxpayers, and preventing the state from reasonably requiring employees to shoulder part of the increased burden of paying for their own retirement benefits.
I.
A. Factual Background
¶59 Arizona has four statewide retirement plans for public employees: the Arizona State Retirement System (“ASRS”), EORP, the Public Safety Personnel Retirement System (“PSPRS”), and the Corrections Officers Retirement Plan (“CORP”). See Hayleigh S. Crawford, Going For Broke: Arizona’s Legal Protection of Public Pension Benefits, 46 Ariz. St. L.J. 635, 655 (2014). EORP is by far the smallest.[10] All are “defined benefit” systems, which means they are “funded by employer and employee contributions and guar-anteef ] the employee a certain benefit upon retirement.” Id. at 639-40.
¶60 In 1985, the Legislature enacted EORP, which provided to elected officials, including judges, a pension in the amount of three and one-third percent of salary for each year worked, up to eighty percent of average yearly salary after twenty years of employment, which was increased to four percent in 1988. See 1985 Ariz, Sess. Laws, ch. 309, § 4 (1st Reg. Sess.) (codified at A.R.S. § 38-808(B)(l) (1985)). That promised benefit, which essentially places elected officials and judges on par with first responders, has never been changed.
¶61 The EORP Plan has four funding sources: employer contributions, employee contributions, court filing fees, and investment proceeds. The employee contribution rate is set by statute and has changed over time. In 1985, it was set at six percent of the employee’s gross salary. See id. (codified at A.R.S. § 38-810(A) (1985)). In 1987, it was increased to seven percent. See 1987 Ariz. Sess. Laws, ch. 146, § 4 (1st Reg. Sess.) (codified at A.R.S. § 38-810(A) (1987)).
¶62 By contrast, employer contributions are determined by actuarial calculations of the amount needed to fund the plan in light of projected payouts and investment income, in order to cover both normal service costs and the amortized amount of the unfunded actuarial accrued liability over a period not to exceed thirty years. In recent years, the employer contribution rate has increased dramatically, from a low of 6.97 percent of each employee’s salary in 2002 to 29.79 percent in 2011, the year in which the reform at issue was adopted. According to EORP, the rate has continued to increase every year since then, to 39.62 percent in the fiscal year ending in 2014. In other words, the employer’s contribution rate has increased 568 percent in twelve years.
¶63 Also at issue in this case are “permanent increases in base benefits” for retired employees. In 1990, the state enacted the first statutory PBI formula, providing retirement payment increases based on the Plan’s investment earnings. 1990 Ariz. Sess. Laws, ch. 236, § 4 (2d Reg. Sess.) (codified at A.R.S. §§ 38-818(B), (E), (F) (1990)). If investments returned more than nine percent, half of the return would be used to fund increases up to four percent, with any remainder placed into a reserve for future benefits increases. Id. After that statute expired in 1994, the Legislature enacted a new PBI formula the following year. Increases were based on the Plan’s investment returns, capped at the lesser of three percent or half of the percentage change in the consumer price index. 1996 Ariz. Sess. Laws, ch. 198, § 1 (2d Reg. Sess.) (codified at A.R.S. § 38-818(F) (1996)). In 1998, the Legislature raised the maximum possible increase to four *51 percent and eliminated any reference to the inflation rate. 1998 Ariz. Sess. Laws, eh. 264, § 1 (2d Reg. Sess.) (codified at A.R.S. § 38-818(F) (1998)). That statutory formula remained in place until S.B. 1609. According to EORP, since the 1998 change, EORP retirees received a four percent annual benefit increase each year until the end of fiscal year 2010.
¶64 The statute at issue in this case is part of a nationwide effort to reform public pensions. As a result of recession and insufficient contributions, as of 2010, public pensions for state employees nationally were underfunded by an estimated one trillion dollars. Pew Center on the States, The Trillion Dollar Gap: Underfunded, State Retirement Systems and the Roads to Reform at 1-3 (2010). Between 2008 and 2013, every state passed some type of pension reform legislation. See National Conference of State Legislatures, Pensions and Retirement State Legislation, available at http://www.ncsl.org/research/ fiscal-policy/pension-legislationdatabase.aspx (last visited Mar. 7, 2016).
¶65 Arizona’s public pensions were not immune to these financial challenges. In 2010, Arizona taxpayers were paying at least $1.39 billion annually to fund the state pension systems, a 448 percent increase from ten years previously and more than the estimated cost for higher education, corrections, or healthcare for indigent people. Crawford at 637. Serious reversals in investment returns in 2000, 2008, and 2009, combined with significant actuarial errors pertaining to the PBI mechanism, contributed to what EORP characterizes as “dramatic decreases” in the Plan’s funding ratio—a benchmark of financial soundness calculated by dividing the plan’s assets by its liabilities. The funding ratio decreased from 141.7 percent in 2001 to 58.4 percent in 2012, a decline EORP considers “alarming.” See generally Fields, 234 Ariz. at 217 ¶ 8, 320 P.3d at 1163 (recounting declining funding ratio). Based on record evidence, EORP suggests that an “80% funding ratio is a generally accepted indicator of a healthy pension plan.” Additionally, EORP’s PBI reserve for future benefit increases declined from more than $40 million in 2000 to zero in 2011. In sum, EORP was severely under-funded, rendering precarious its ability to pay future pension obligations.
¶66 In an effort to place EORP, CORP, and PSPRS on a more sound financial footing, the Legislature passed S.B. 1609 in 2011. As relevant here, the statute increased the employee contribution rate from seven percent to ten percent for fiscal year 2011-12, to 11.5 percent in 2012-13, and a maximum of thirteen percent thereafter. A.R.S. § 38-810(F)(l)-(4) (2011), renumbered as A.R.S. § 38-810(G)(l)-(4) (2013). The Legislature also included a “maintenance of effort” clause, which provides that employee contributions above seven percent of salary shall not be used to reduce the employer’s contribution. A.R.S. § 38-810(G) (2011), renumbered as A.R.S. § 38-810(H) (2013).
¶67 Senate Bill 1609 also made changes to the PBI formula in EORP, PSPRS, and CORP. First, it ended future inflows into the PBI reserve fund. A.R.S. § 38-818.01(E). Second, it increased the investment return rate upon which future PBIs would be calculated. A.R.S. § 38-818.01(D). Finally, it maintained a four percent maximum for future benefit increases, it pegged such increases to the Plan’s funding ratio, with larger benefit increases as the actuarial soundness of the Plan improved. A.R.S. § 38-818.01(0). These changes—the increased employee contribution rate and the changes in the PBI formula—are at issue here.
¶68 In 2013, EORP was closed to new members so that elected officials and judges taking office thereafter are no longer eligible. 2013 Ariz. Sess. Laws, ch. 216, § 9 (1st Reg. Sess.). Instead, they participate in a “defined contribution” program.[11]
B. Applicable law
¶69 The Contract Clause of our Declaration of Rights, comprised by Arizona Constitution article 2, section 25, provides that “no ... law impairing the obligation of a con *52 tract[] shall ever be enacted.” Historically, Arizona courts have applied the United States Supreme Court’s test for determining violations of the Contract Clause of the Federal Constitution. In order to violate the Contract Clause, a law must substantially impair a contractual relationship. The state may justify the impairment by demonstrating a significant, legitimate public purpose, and that the impairment is reasonable and appropriate. See, e.g., Fund Manager, Pub. Safety Pers. Ret. Sys. v. City of Phoenix Police Dep’t Pub. Safety Pers. Ret. Sys. Bd., 151 Ariz. 487, 491, 728 P.2d 1237, 1241 (App. 1986) (citing Energy Reserves Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983)).
¶70 This Court first held that public pension benefits are contractual rights in Yeazell, 98 Ariz. at 114-15, 402 P.2d at 544-45. Because the Arizona Constitution prohibits gifts of public funds to individuals,[12] the Court reasoned that “state pensions cannot be sustained as constitutional unless anchored to a firmer basis than that of a gift.” Id. at 112, 402 P.2d at 543. On that basis, the Court determined that public pensions are contractual in nature, and that “[cjontrover-sies as to those rights should be settled consistent with the law applicable to contracts.” Id. at 113-14, 402 P.2d at 544.
¶71 More specifically, the Court held that “the laws of the state are a part of every contract.” Id. at 113, 402 P.2d at 544. Because retirement benefits are “a valuable part of the consideration for the entrance into and continuation in public employment,” the “right to a pension becomes vested upon acceptance of employment.” Id. at 115, 402 P.2d at 545. A “contract cannot be unilaterally modified nor can one party to a contract alter its terms without the assent of the other party.” Id. Applying those principles, the Court held that a legislative amendment “may not be arbitrarily applied retroactively to impair the contract” as it existed at the time the employment relationship was established. Id. at 117,402 P.2d at 546.
¶72 The Court in Yeazell and subsequent cases essentially created a one-way ratchet. Baseline benefits are set on the employment date. They can be increased but never decreased without members’ consent. Such un-bargained for, open-ended benefits are hardly compelled by the Gift Clause, though they might well be forbidden by it. Cf. Turken v. Gordon, 223 Ariz. 342, 351 ¶ 43, 224 P.3d 158, 167 (2010) (payments of public funds must be supported by consideration that is not disproportionate to the value received). In dissent, Justice Udall declared that the majority opinion “had no support in reason or logic nor the case law ... and will create problems far beyond the immediate controversy.” Yeazell, 98 Ariz. at 124, 402 P.2d at 551 (Udall, J., dissenting). Justice Udall was prescient.
¶73 However, the Yeazell decision embraced a vitally important limiting principle to ensure that the supposed pension contract would not necessarily be a financial suicide pact for the taxpayers. “We do not ... mean to imply what rights or remedies might be available to either party in a situation where it is established that a retirement plan is actuarially unsound,” the Court declared. Id. at 117, 402 P.2d at 546. In such circumstances, the Court stated, ordinary contract principles such as mutual mistake of fact could be applied to modify or rescind a contract in appropriate circumstances. Id. at 116, 402 P.2d at 546. Specifically, if both parties “labored under the mistaken assumption that there was a fund sufficient to afford ... beneficiaries of the fund the amount provided” by the original plan, the state could modify the contract if it carried its burden of proving the mutual mistake. Id. Although the State presented abundant evidence that EORP was structurally unsound prior to S.B. 1609, the trial court never addressed the question of mutual mistake, instead disposing of the case entirely under the Pension Clause of our Constitution.
¶74 In 1998, upon legislative referral, Ati-zona voters enacted Proposition 100, which added article 29, section 1 to the Arizona Constitution. Most relevant to the issues pre *53 sented here is section C, which provides, “Membership in a public retirement system is a contractual relationship that is subject to article II, section 25 [the Contract Clause], and public retirement system benefits shall not be diminished or impaired.”[13]
¶75 In Fields, this Court struck down under the Pension Clause S.B. 1609’s change in the permanent benefit increase formula as to retired EORP members. 234 Ariz. at 221 ¶ 34, 320 P.3d at 1167. The Court concluded that the statutorily prescribed permanent benefit increase formula is a Plan “benefit,” and that S.B. 1609’s formula modification violated article 29, section 1 because it “diminishes and impairs the retired members’ benefits.” Id. at 216 ¶ 1, 220-22 ¶¶ 30-36, 320 P.3d at 1162,1166-68.
¶76 In this action, on cross-motions for summary judgment, the trial court concluded that the changes to the permanent benefit increase formula and contribution rates for active Plan members violated the Pension Clause. Because it so ruled, it did not reach any of the other constitutional issues. Although we agree with the majority’s outcome on the PBI formula issue, we believe that the contribution rate is not a pension “benefit,” and that the trial court improperly granted summary judgment to the plaintiffs without considering defendants’ defenses under Yea-zell or the Contract Clause.
II.
A. The Pension Clause
¶77 Although the majority reaches the Pension Clause issue only with regard to the PBI formula and not to contribution rates, we consider it in both contexts because it was the sole basis for the trial court’s contribution rates ruling as embraced by the concurring opinion.
¶78 “In interpreting a constitutional amendment, our primary purpose is to ‘effectuate the intent ... of the electorate that adopted it.’ ” Id. at 219 ¶ 19, 320 P.3d at 1165 (quoting Jett v. City of Tucson, 180 Ariz. 115, 119, 882 P.2d 426, 430 (1994)). In doing so, we give words “the meaning most common to the ordinary individual.” Downs v. Sulphur Springs Valley Elec. Coop., 80 Ariz. 286, 293, 297 P.2d 339 (1956); accord Fields, 234 Ariz. at 219 ¶ 19, 320 P.3d at 1165.
¶79 In addition to the text’s plain language, the ballot pamphlet can aid in determining the electorate’s intent. See Calik v. Kongable, 195 Ariz. 496, 498 ¶ 10, 990 P.2d 1055, 1057 (1999). The ballot measure’s proponents (no opponents submitted statements) all address one overriding purpose: to prevent the legislature from raiding pension funds, which had occurred in other states. See Ariz. Sec’y of State, 1998 Publicity Pamphlet 6-12 (1998), available at http://apps. azsos.gov/election/1998/Info/PubPamphleV ProplOO.html.
¶80 That objective reflects in the first two of article 29, section l’s three substantive provisions. Subsection A declares, “Public retirement systems shall be funded with contributions and investment earnings using actuarial methods and assumptions that are consistent with generally accepted actuarial standards.” Subsection B provides, “The assets of public retirement systems, including investment earnings and contributions, are separate and independent trust funds and shall be invested, administered and distributed as determined by law solely in the interests of the members and beneficiaries of the public retirement systems.”
¶81 On its face, subsection C, at issue here, makes two changes from prior law regarding pension contracts.[14] First, it establishes that “[mjembership in a public retirement system is a contractual relationship that is subject to article II, § 25,” the Contract Clause. This language marks a significant departure from *54 Yeazell and its progeny because instead of applying ordinary contract principles to pension contract terms, it establishes that the relationship is subject to Contract Clause rules, which generally provide greater leeway to contract modifications by government. See, e.g., Fund Manager, Pub. Safety Pers. Ret. Sys., 151 Ariz. at 491, 728 P.2d at 1241. As a result, this change is extremely consequential for the present case.
¶82 Second, subsection C states that “public retirement system benefits shall not be diminished or impaired.” This too marks a departure from prior law, more favorable to Plan members and beneficiaries in this instance because it suggests that benefits cannot be diminished or impaired 'period, even in light of contract defenses that might previously have been raised under Yeazell.
¶83 It therefore makes an enormous difference whether a particular pension contract provision is a “benefit.” If so, it is legally sacrosanct; if not, it is subject to the Contract Clause’s modification rules. The Court recognized this crucial distinction in Fields, declaring that the “Contract Clause applies to the general contract provisions of a public retirement plan, while the Pension Clause applies only to public retirement benefits.” 234 Ariz. at 218 ¶ 17, 320 P.3d at 1164. In this ease, the majority correctly applies the changes wrought by the Pension Clause to invalidate changes to the PBI formula, but improperly ignores them in order to strike down the change in contribution rates.
B. Permanent benefit increases
¶84 This Court decided in Fields that the PBI formula for retired Plan members is a benefit. Because S.B. 1609 diminished or impaired that benefit, it violated the Pension Clause. 234 Ariz. at 220 ¶¶ 26-27, 320 P.3d at 1166.
¶85 The State and EORP argue that the vesting statute, A.R.S. § 38-810.02, changed the pension contract for employees hired after its 2000 effective date. Specifically, they urge that for such employees, benefits do not vest until retirement, hence the state may determine benefit increases upon retirement.
¶86 As a general proposition, we agree with defendants that the state is free to change pension terms or benefits or eliminate them altogether for new employees, as the state did by changing to a defined-contribution system for judges and elected officials in 2013. But their interpretation of the vesting statute collides with the contractual nature of public pensions, under Yeazell and as embraced and modified by article 29, section 1. Prior to the vesting statute in 2000, all seem to agree that Plan members had a contractual expectation of a particular formula for permanent benefit increases. The State and EORP posit that after the vesting statute, that contractual expectation was replaced by a contingent expectation; that is, the state may determine benefit increases upon retirement.
¶87 Such a contingent, open-ended possibility fails for two reasons. First, it does not provide a sufficiently definite term to satisfy the requirement of contractual consideration. See, e,g., Savoca Masonry Co. v. Homes & Son Constr. Co., 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975) (requiring sufficient specification of terms for mutual assent). Second, it raises the Gift Clause concerns that animated the Yeazell decision because the state is deciding the amount of compensation after work is performed, thus giving rise to the prospect of a gift rather than proportionate, bargained-for consideration. 98 Ariz. at 112-13, 402 P.2d at 543-44.
¶88 Accordingly, we conclude that the vesting statute did not alter the contractual expectations of EORP Plan members, and thus the Court’s conclusion in Fields that the PBI formula is protected by the Pension Clause also controls here. Because S.B. 1609’s modification to the PBI formula impaired or diminished that benefit for active Plan members, it violates the Pension Clause.
C. Contribution Rates
¶89 By contrast, contribution rates are not benefits and thus do not fall within the Pension Clause’s strictures.
¶90 By their nature, pension plans fall into one of two categories: defined benefits or defined contributions. In the former, benefits are fixed but the contributions may vary; in *55 the latter, contributions are fixed but the payouts may vary. See, e.g., Crawford at 639-42.
¶91 Article 29, section 1(B) uses the term “contributions” and makes clear they are Plan “assets,” providing that they are to be held in trust for the Plan’s beneficiaries. Section 1(A) provides that public pension systems “shall be funded with contributions and investment earnings using actuarial methods and assumptions that are consistent with generally accepted actuarial standards.” That language indicates contributions are not fixed, but rather may vary over time to ensure the Plan’s financial integrity. Indeed, at oral argument, plaintiffs’ counsel could point to nothing in the ballot materials that would have placed voters on notice that the state could not adjust employee contribution rates to ensure the Plan’s financial viability.
¶92 Thus, unlike the PBI formula to which an employee is contractually “entitled” according to statutory provisions in effect on the hiring date, Fields, 234 Ariz. at 219 ¶ 23, 320 P.3d at 1165, public employees are not entitled to a fixed contribution rate. Indeed, if they were, the failure to raise sufficient funds through employee contributions could jeopardize the Plan’s financial viability required under article 29, sections 1(A)-(B), thus justifying the state’s change to those rates. By contrast, if the entire burden of providing adequate pension contributions is placed upon the state, it would create an uncertain, open-ended, and limitless obligation that could run afoul of the Gift Clause. See Turken, 223 Ariz. at 351 ¶ 43, 224 P.3d at 167.
¶93 The employee contribution rate statute, A.R.S. § 38-810, has never contained language indicating an expectation or guarantee. In fact, the employee contribution rate has varied over time, including an increase from six to seven percent in 1987, shortly after EORP was created. See 1987 Ariz. Sess. Laws., eh. 146, § 4 (1st Reg. Sess.) (codified at A.R.S. § 38-810(A) (1987)). Arizona tax statutes also treat pension contributions and benefits differently, with the former generally shielded and the latter generally exposed to taxation. See A.R.S. §§ 38-810, -810.01, - 811, 43-1022. Arizona contribution rate statutes thus do not exhibit the indicia of contractual entitlement that the Court found with regard to the PBI formula in Fields, 234 Ariz. at 219 ¶¶ 23-24, 320 P.3d at 1165.
¶94 Other courts that have considered the precise issue of whether pension contribution rates are a benefit have held they are not. In Taylor v. City of Gadsden, 767 F.3d 1124 (11th Cir. 2014), plaintiffs argued, as here, that they had a protected contractual pension right to a particular contribution rate. Holding the change did not violate the state or federal Contracts Clauses, the court explained, “Here, the City did not alter plaintiffs’ pension benefits-, instead, it altered their pension obligations.” Id. at 1136.
¶95 The Georgia Supreme Court likewise recently considered a challenge to sizable increases in employee contribution rates. The court observed that the “pension contribution increases were not retroactive and did not change a member’s benefit formula, calculation of pension benefit, or actual benefit amount payable at the time of retirement.” Borders v. City of Atlanta, 298 Ga. 188, 779 S.E.2d 279, 281 (2015). The court upheld the contribution rate change because it “did not alter Plaintiffs’ pension benefits, but rather modified their pension obligations, and in no manner divested Plaintiffs of their earned pension benefits, so as to implicate constitutional concerns.” Id. at 287; see also In re Enrolled Sen. Bill 1269, 389 Mich. 659, 209 N.W.2d 200, 203 (1973), followed in AFT Michigan v. Michigan, 303 Mich.App. 651, 846 N.W.2d 583, 593-94 (2014).
¶96 Furthermore, if contribution rates were benefits, we have difficulty perceiving which aspects of the pension contract would be subject to the Contract Clause rather than to the absolute prohibition against benefit impairment in article 29, section 1(C). Rather, as the Court stated in Fields, that special protection is reserved for benefits, which contribution rates are not. Indeed, we are loath to attribute to voters the intent to have taxpayers alone shoulder all unanticipated financial burdens of guaranteed pension payouts, absent clear evidence they were placed on notice that they were doing so when they adopted article 29, section 1.
*56 ¶97 The majority does not address this issue, finding instead that the changes to the contribution rate violate Yeazell. But the concurring opinion by Judge Cattani would affirm the trial court’s holding that employee contribution rates are benefits and thus unchangeable under the Pension Clause.
¶98 Judge Cattani compares the defined-benefit contribution to an annuity. Respectfully, it is not. The common definition of annuity is “[a] fixed sum of money payable periodically.” Black’s Law Dictionary 105 (9th ed. 2009). The defined-benefit pension, by contrast, involves fixed benefits but requires variable payments. Judge Cattani seems to recognize that distinction by observing that if this were an annuity, the amount of payments, or cost, would “be determined upon the employee’s retirement.” But in reality, under EORP, the payments are made and calculated during employment, based not only on that particular employee’s circumstances but the pension system as a whole; indeed, deferring until retirement the amount of an employee’s compensation would present Gift Clause problems because it would be indeterminate and open-ended. Perhaps the legislature could improve the current system by purchasing annuities for its employees, but that is not the system before us.
¶99 Judge Cattani also observes that the system has no “modification provision” to alert employees that contribution rates might go up. Were this a real rather than fictional contract, perhaps it would contain such a provision. As with many benefits, such as health insurance, parking, or public transit passes, employee costs can vary. The benefit is the outcome, not how much it costs the employer or employee. That is the nature of a defined-benefit as opposed to a defined-contribution retirement plan. Moreover, as noted, the statutes governing employee contributions have never created an expectation or entitlement, and the rate has changed multiple times over the years. A post hoc transformation of a defined-benefit pension plan into an annuity whose cost is determined upon retirement does not alter the legal reality that employee contribution rates are not benefits.
¶100 For the foregoing reasons, the trial court erred in holding that S.B. 1609’s employee contribution rate increase violates the Pension Clause, the sole basis for its ruling on contribution rates.
D. The Contract Clause and Yeazell
¶101 The majority bases its decision striking down the contribution rate changes on its view that Yeazell allows no changes whatsoever to a pension plan that are to the members’ disadvantage, absent the members’ consent. As we noted earlier, that conclusion misreads Yeazell, which expressly recognizes contract defenses such as mutual mistake regarding the Plan’s actuarial soundness. 98 Ariz. at 116, 402 P.2d at 546. It also ignores the constitutional changes that significantly alter our jurisprudential landscape.
¶102 The majority says we “over-read” Yeazell because although it recognizes the mutual mistake defense, the Court stated it did “not, however, mean to imply what rights or remedies might be available to either party in a situation where it is established that a retirement plan is actuarially unsound. This is a matter beyond the issues of the present litigation.” See ¶ 24 (citing Yeazell, 98 Ariz. at 117, 402 P.2d at 546). But that is precisely the issue in this litigation; and whatever “rights or remedies might be available,” it is judicial abdication to preemptively foreclose them.
¶103 Because this ease was decided on cross-motions for summary judgment, the trial court made no factual findings on contract defenses. As this Court is not affirming the trial court’s ruling that the change in employee contribution rates violates the Pension Clause, and as the parties below fiercely contested the factual issues pertaining to contract defenses, affirming the summary judgment is manifestly inappropriate. See Ariz. R. Civ. P. 56(a); see also Peterson v. Valley Nat. Bank of Phoenix, 90 Ariz. 361, 362, 368 P.2d 317, 318 (1962) (stating summary judgment inappropriate where there are material contested issues of fact or where there is the slightest doubt as to the facts).
11104 Rather than remand the issue for factual determination, the majority dons trial *57 court robes to determine that EORP and the State are “unable to prove that defense.” Selectively reviewing the record, the majority finds that the Plan’s financial worries are attributable solely to EORP’s investment choices, and states that “disappointment about anticipated investment returns does not qualify as a [mutual] mistake.” See ¶ 26. Not only that, but “the Plan’s actuarial soundness is within the Legislature’s control,” because it can always increase taxes and court fees, apparently ad infinitum. Id. In reality, EORP presented evidence of a variety of causes, and did not learn until a 2010 audit that the Plan was severely unfunded. Until then, all parties labored under the assumption that the Plan was aetuarially sound—an assumption that proved to be mistaken. By finding otherwise, the majority short-circuits the mistake of fact analysis that Yeazell expressly recognizes.
¶105 The majority errs even more fundamentally by beginning and ending its analysis with Yeazell. Article 29, section 1 now governs the contractual relationship regarding public employee pensions. Section 1(C) very plainly states that although benefits are sacrosanct, other parts of the pension contract are governed by the Contract Clause. We said as much in Fields, 234 Ariz. at 218 ¶ 17, 320 P.3d at 1164 (“The Contract Clause applies to the general contract provisions of a public retirement plan, while the Pension Clause applies only to public retirement benefits.”). As noted previously, we cannot assume that the amendment’s drafters were ignorant of past governing law and the significant change effected by the ballot language. Our job is to enforce that language, not ignore it.
¶106 But ignore it the majority does, justifying itself with the proposition, remarkable on multiple levels, that “analyzing whether the Bill would pass review under the Contract Clauses were it not for Yeazell and the Gift Clause is unnecessary and violates the principle of judicial restraint.” See ¶ 28. Article 29, section 1 governs public pensions. It does so in all, not just some, of its particulars. Declining to apply all of its provisions is not judicial restraint but pick-and-choose jurisprudence.
¶107 As we decided in Fields, public pension contract terms that are not benefits are subject to the Contract Clause. Neither this Court nor the trial court made the requisite determination that the contribution rate changes violate the Contract Clause; thus, remand is imperative. See State v. Brita, 158 Ariz. 121, 124, 761 P.2d 1025, 1028 (1988) (“It is highly undesirable to attempt to resolve issues for the first time on appeal, particularly when the record below was made with no thought in mind of the legal issue to be decided.”). But even so, based on available facts and contrary to the majority’s conclusion, the record is quite clear that the changes constitute “a significant and legitimate public purpose,” and that the impairment is reasonable and appropriate. Fund Manager, Pub. Safety Pers. Ret. Sys., 151 Ariz. at 491, 728 P.2d at 1241. Averting a pension crisis and protecting the Plan’s actuarial soundness are not only significant and legitimate, they are the very essence of the constitutional guarantees the voters approved. The Plan members’ contribution rate increases are dwarfed by the increased taxpayer contributions. Senate Bill 1609 takes pains to not displace the state’s obligations or to raid pension funds. Based on the record, we would uphold the contribution rate changes under the Contract Clause (and therefore under article 29, section 1(C)). At the very least, we would remand to the trial court to determine this question in the first instance.
III.
¶108 If ever there were a case in which we should seriously indulge the presumption of statutory constitutionality, this is it. The majority winks at that rule, then utterly fails to apply it. It repeatedly invokes the mantle of judicial restraint while casually invalidating a statute designed to preserve the financial stability of a public employee pension plan, a purpose so important that the voters made it part of our state’s organic law.
¶109 The majority opinion portends a huge financial windfall for the class members, a burden the taxpayers will shoulder. Under such circumstances, we should act with great restraint, lest the rule of law be undermined *58 by a public perception that this decision is of the judges, by the judges, and for the judges. On this important issue, the majority exhibits no such restraint, and we therefore respectfully dissent.

. ASRS covers about 535,000 members, EORP has approximately 2,000, and PSPRS and CORP together have about 45,000. Id.

. A defined contribution plan does not provide a guaranteed benefit amount at retirement. Rather, employers and employees contribute to a plan in which benefits are based on contributions plus or minus investment returns.

. The Gift Clause, in article 9, section 7 of the Arizona Constitution provides, "Neither the state, nor any ... subdivision of the state shall ever ... make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation. ...”

. This provision is now codified in sections C and D of article 29, section 1 of the Arizona Constitution. See Laws 2016, S.C.R. 1019, § 1, Prop. 124, approved election May 17, 2016, eff. May 26, 2016.

. We presume that the legislature (in this instance, the measure’s drafters and the electorate) knows the prior law, and if it changes that law, that it intends that those changes have real and substantial effect. See, e.g., Stone v. I.N.S., 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995); Brousseau v. Fitzgerald, 138 Ariz. 453, 455, 675 P.2d 713, 715 (1984).